36 A.3d 521

**Benn RAY et al.**

v.

**MAYOR & CITY COUNCIL of BALTIMORE et al.**

**No. 0215, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Feb. 1, 2012.

G. Macy Nelson (David S. Lynch, Office of G. Macy Nelson, LLC, on the brief), Towson, MD for appellant.

Sandra Gutman & Charles S. Hirsch (Jason, T. Vettori, Smith, Gildea & Schmidt, LLC, Towson, MD, Jon M. Laria, Ballard Spahr, LLP, Baltimore, MD, George A. Nilson City Solicitor, Adam S. Levine, Baltimore, MD) on the briefs, for appellee.

·ZARNOCH, GRAEFF, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

MOYLAN, J.

This is one of three closely related appeals, all challenging in one way or another the same basic decision by the City of Baltimore. That decision was to create a Planned Unit Development ("PUD")[1] to be known as the 25th Street Station, in the Remington/Charles Village area of north central Baltimore. The appellees in all three cases include the Mayor and City Council of Baltimore; Bruce Mortimer, Anderson Automotive Group, and Twenty–Fifth Street, LLC (collectively, "Subject Property Owners"); and WV Baltimore–24/Sisson, LLC and WV Baltimore H 25, LLC (collectively "Developers"). The challenges were ultimately decided in the Circuit Court for Baltimore City, in each case ruling that the challengers lacked standing to bring the challenges.

Our special concern on this appeal, therefore, is with the threshold requirement of standing to obtain judicial review of a zoning decision by the City Council. Maryland Code, Article

---

[1]. "A PUD is a relatively modern zoning concept created to provide a degree of flexibility in uses and design not available under strict Euclidian zoning. Essentially, a PUD, when approved by a governmental body grants a variety of uses within a development that would otherwise not be permitted under the pre-existing or, in the case of Baltimore City's zoning regulations, underlying Euclidian zoning of the pertinent parcel or assemblage of land. A distinguishing feature of PUDs is the incorporation of a form of site planning requirement at its inception and/or in the latter stages of the overall approval process, if that process is multitiered. For a more extensive discussion of PUDs, see *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments of Prince George's County,* 138 Md.App. 589, 623–24, 773 A.2d 535, 555–56 (2001)." *Maryland Overpak Corp. v. Mayor & City Council of Baltimore,* 395 Md. 16, 23 n. 4, 909 A.2d 235 (2006).

66B, Zoning Enabling Act, § 2:09(a)(1), provides in pertinent part:

(a) *Who may appeal; procedure*—

(1) An appeal to the Circuit Court for Baltimore City may be filed ... by any person ... aggrieved by:

. . . .

(ii) A zoning action by the City Council.

(3) This subsection does not change the existing standards for review of any zoning action.

See *Committee for Responsible Development on 25th Street v. Mayor and City Council of Baltimore*, 137 Md.App. 60, 74–78, 767 A.2d 906 (2001).

## Developmental Background

The proposed PUD will occupy an 11.5 acre parcel of land, bounded by 25th Street and Huntingdon Avenue on the north, by Maryland Avenue on the east, by 24th Street and Sisson Street on the south, and by the CSX railroad tracks on the west. The north-south axis of Howard Street essentially bisects the parcel, just as it separates the Charles Village neighborhood to the east of Howard Street from the Remington neighborhood to its west.

The Subject Property Owners have used the land for over half a century as a car dealership. Most recently, General Motors and Honda dealerships have operated from the location. As the representative of the Baltimore Department of Planning informed the Baltimore City Council at a public hearing, the General Motors dealership would be closing and the Honda dealership would be moving to Baltimore County.

On April 19, 2010, Councilwoman Belinda K. Conaway introduced Council Bill 10–0488 to the City Council. The Bill was for the purpose of approving the application of the Developers to designate the 11.518 acres as a Business and Industrial PUD. The PUD contemplates the development of a mixed-use, residential and commercial development project. The plans for the proposed development include approximately 70 to 80 apartment units; 337, 568 square feet of rented floor space;

and 1,027 parking places. "Big-box" retailer Wal–Mart plans to occupy approximately 100,000 square feet of retail space where it plans to build a full-scale grocery. At the time the City approved the PUD, another "big-box" retailer, Lowes Home Center, planned to occupy approximately 150,000 square feet of retail space. The City Council assigned Bill 10–0488 to the Land Use and Transportation Committee, which conducted public hearings on September 15 and September 22, 2010. At the September 15 hearing, Councilwoman Conaway, the Bill's sponsor, spoke to its purpose:

> At this site there are 11 acres at the Anderson Automotive site which will be vacated very soon. We have a proposal for the development project which will hopefully benefit the community. I think that it's very important that we have something at that site.
>
> It is not the preference of myself or the community to have 11 acres of vacant land just sitting with nothing going on. Therefore, this project is being presented to the Land Use Committee to determine if the use of the land is appropriate. Today's hearing is not about what will be placed there, but how the land will be used.
>
> So we're looking forward to all of the agency reports and testimony, but again I want to reiterate that it is very important that we have something viable on these 11 acres that benefits the community.

The Land Use and Transportation Committee recommended the approval of the Bill on October 6, 2010. On November 22, 2010, the City Council unanimously adopted the Bill and passed Ordinance 10–397, which established the PUD at the subject property. On November 24, 2010, Mayor Stephanie Rawlings–Blake signed Ordinance 10–397 into law. On December 16, 2010, the Baltimore City Planning Commission approved the final design of the 25th Street Station project.

On December 21, 2010, the appellants in this case, Benn Ray and Brendan Coyne, petitioned to the Circuit Court for Baltimore City for judicial review of the City Council's decision to adopt the 25th Street Station PUD. Filing responses in

opposition to the petition for judicial review were not only the City, the Subject Property Owners, and the Developers, but also the Greater Remington Improvement Association and the Charles Village Civic Association. On February 11, 2011, the Developers and the Subject Property Owners filed separate Motions to Dismiss the Petition for Judicial Review. The City filed its own Motion to Dismiss on February 14, 2011. A hearing on the Motion to Dismiss was held before Judge Pamela J. White on March 7, 2011. In a four-page Memorandum Opinion and Order filed on March 20, 2011, Judge White granted the Motions to Dismiss, ruling that the appellants lacked standing to petition for judicial review. The appellants have appealed from that dismissal.

## The Contentions

The contentions before us are threefold. The appellants claim

1. that Judge White erroneously ruled that they did not enjoy standing by virtue of being *prima facie* aggrieved;

2. that Judge White erroneously ruled that their personal or property rights were not specially and adversely affected; and

3. that Judge White erroneously ruled that the appellant Coyne's testimony about his property value was inadmissible.

## The Elephant in the Room

As we prepare to address the standing of the two appellants, there is an elephant in the room that, bizarrely, almost everyone is totally ignoring. At least tentatively, we will acknowledge its presence. The appellant Benn Ray resides at 279 W. 31st Street. Ray, however, is not the owner of the property. He rents it. In terms of standing, that may not, *ipso facto*, be disqualifying. But it may. It is at the very least highly unusual. Despite its being an extraordinary feature, however, it is nowhere mentioned in the appellants' primary brief. The brief recites simply that Ray lives at such

and such a place and then goes on nonchalantly to make his various standing arguments just as if he were the owner of the property.[2] The responsive brief of the City, in its turn, also makes no mention of this potentially critical issue. Nor does the brief of the Subject Property Owners. The Developers, on the other hand, do in their brief allude to the issue, but only briefly and not as a matter of major focus. The opinion of the trial court makes no mention of Ray as a mere renter. At the hearing on the Motion to Dismiss on March 7, 2011, there was no mention made of Ray's non-owner status by the City, by the Subject Property Owners, or by the Court. Only the Developers mentioned the subject, but without the citation of any legal authority:

> Mr. Ray, according to his affidavit, doesn't even own property. He rents. So he's out. He can't be *prima facie* aggrieved.

The appellants, also without citing any legal authority, made brief reply to the raising of the issue by the Developers:

> There is no requirement in law for the standing analysis that citizens who challenge the project be an owner ... [T]here was no requirement in the law for standing that the challenger—the citizen or challenger be an owner.

The court, in its turn, made no ruling on this issue. It may have deemed it unnecessary to do so because Ray, in any event, lacked standing for other reasons. Our chagrin is that this highly unusual circumstance is at the least worthy of notice and comment and is not some run-of-the-mill common-place to be taken casually for granted.

■ For standing purposes in zoning challenges, the opinion of Judge Wilson K. Barnes for the Court of Appeals in *Bryniarski v. Montgomery County,* 247 Md. 137, 230 A.2d 289 (1967), is the authoritative tap root. As Judge Kehoe stated in *Chesapeake Bay Foundation v. Clickner,* 192 Md.App. 172, 185, 993 A.2d 1163 (2010), "*Bryniarski* is the landmark case in Maryland on 'aggrievement' as a requirement for standing in

---

2. The appellants do devote half a page to this issue in their Reply Brief.

land use appeals." The *Bryniarski* opinion, 247 Md. at 143, 230 A.2d 289, sets out the two basic preconditions:

> Under the applicable statutory law, *two conditions prece-dent must be met before a person has standing* to appeal to the Circuit Court for Montgomery County from a decision of the Board: (1) he must have been a party to the proceeding before the Board, and (2) *he must be aggrieved by the decision of the Board.*

(Emphasis supplied).

■■■ Our concern in this case is with the second threshold requirement of being an "aggrieved" party. Judge Barnes's opinion lays out the basic requirements for such qualifying aggrievement:

> Generally speaking, the decisions indicate that *a person aggrieved* by the decision of a board of zoning appeals *is one whose personal or property rights are adversely affected by the decision of the board.* The decision must not only affect a matter in which the protestant has a specific interest or property right but *his interest* therein *must be* such *that he is personally and specially affected in a way different from that suffered by the public generally.* The circumstances under which this occurs have been determined by the courts on a case by case basis, and the decision in each case rests upon the facts and circumstances of the particular case under review.

(Emphasis supplied).

■■ As a benefit of fortuitous geography, however, some aspiring protestants enjoy a procedural shortcut to aggrieved status:

> An adjoining, confronting or nearby property owner is deemed, *prima facie* to be specially damaged and, therefore, a person aggrieved.

247 Md. at 145, 230 A.2d 289. See also *120 West Fayette Street v. Mayor & City Council of Baltimore,* 407 Md. 253, 271–72, 964 A.2d 662 (2009) ("Such property owners are granted prima facie aggrieved status due to the sheer proximity of their property to the area that is the subject of the complaint."); *Sugarloaf v. Department of Environment,* 344

Md. 271, 297, 686 A.2d 605 (1996); *Wier v. Witney Land Company*, 257 Md. 600, 608–13, 263 A.2d 833(970); *Marcus v. Montgomery County*, 235 Md. 535, 538–39, 201 A.2d 777 (1964) ("[T]he text writers and the cases in this jurisdiction and other jurisdictions are in general agreement that an adjacent owner—in the sense of being near or close by—as well as an abutting owner, whose legal rights have been infringed, is an aggrieved person."); *Holland v. Woodhaven Building and Development, Inc.*, 113 Md.App. 274, 280–81, 687 A.2d 699 (1997).

■ It is this procedural shortcut to aggrievement that brings to the forefront the appellant Ray's status as a non-property-owner. The basic requirement for standing remains aggrievement. Conceivably, one could establish that without being a property owner. There is, however, a gaping procedural and evidentiary chasm between special aggrievement and *prima facie* aggrievement. It is the latter variety of aggrievement that Ray, as a non-property-owner, is denied. He is, of course, free to try to establish special aggrievement with its attendant allocation of a stern burden of proof. What he lacks as a non-property owner is the easy *prima facie* comfort of presumptive aggrievement and standing. What non-ownership may deny Ray is not a chance ultimately to establish aggrieved status, but the benefit of the short and easy route to such status.

■ Even the *prima facie* shortcut, albeit conferring generous procedural benefits, is not completely hazard-free. *Bryniarski*, 247 Md. at 145, 230 A.2d 289, makes clear:

*The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for appeal and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved.*

*Id.* (emphasis supplied).

■ Thus, the presumption of aggrievement may be rebutted, and a "nearby" or even an abutting property owner may ultimately be shown to be unaggrieved and thereby denied standing. The converse is also true. Even one who does not enjoy presumptive standing by virtue of property

ownership and proximity to the situs in dispute may nonetheless establish actual aggrievement. Judge Barnes went on:

> A *person whose property is far removed* from the subject property ordinarily *will not be considered a person aggrieved. But he will be* considered a person aggrieved *if he meets the burden of* alleging and *proving* by competent evidence—either before the board or in the court on appeal if his standing is challenged—*the fact that his personal or property rights are specially and adversely affected* by the board's action.

247 Md. at 145, 230 A.2d 289 (emphasis supplied).

In *Holland v. Woodhaven Building and Development, Inc.*, 113 Md.App. at 281, 687 A.2d 699, we entertained an argument by one who was not "a nearby property owner" that he had, for standing purposes, nonetheless established his aggrieved status:

> *Appellants* alternatively *argue* that the fourth protestant, *Mr. Holland, was sufficiently aggrieved* to challenge the Commission's approval of the subdivision. *Appellants concede that Mr. Holland is not a nearby property owner.* Nevertheless, *appellants argue that Mr. Holland demonstrated that he was specially aggrieved* by the subdivision approval in a manner distinct from the public generally.

(Emphasis supplied).

■ Thus, both *prima facie* aggrievement and demonstrated special aggrievement simply give rise to rebuttable presumptions. They satisfy burdens of production for or against standing, but they remain vulnerable to being rebutted on the ultimate merits of aggrievement. The juxtaposition between *prima facie* aggrievement and special aggrievement is starkly illustrated by *Chesapeake Bay Foundation v. Clickner.* Clickner had received two zoning variances for projected improvements on Big Dobbins Island in the Magothy River. The Chesapeake Bay Foundation and the Magothy River Association sought to challenge the granting of those variances. Clickner moved to dismiss their appeals to the Anne Arundel County Board of Appeals on the ground that they lacked standing to take the appeal.

Judge Kehoe's opinion for this Court first affirmed the correctness of the decision of the Board of Appeals that the Chesapeake Bay Foundation and the Magothy River Association, because they were not nearby property owners, were not *prima facie* aggrieved:

> In its decision, the majority of the Board focused upon the fact that *neither CBF or MRA asserted a property interest in the vicinity of Big Dobbins Island.* First, the Board majority correctly noted that, *since neither appellant owned real property in close proximity to the island, neither was prima facie aggrieved.*

192 Md.App. at 187, 993 A.2d 1163.

It was when our analysis then turned to the very different question of whether the CBF and the MRA might nonetheless establish special aggrievement that we pointed out that "contrary to the Board's analysis, property ownership is not a prerequisite to aggrievement." 192 Md.App. at 189, 993 A.2d 1163. Property ownership is not an absolute prerequisite to being specially aggrieved and is not even an important factor in the relatively rarer cases where the complainant is a governmental agency rather than a private citizen. There is a critical difference between the classes of protestants.[3]

---

**3.** The property ownership that is virtually, albeit not absolutely, a *sine qua non* in the case of a citizen protestant is obviously not a prerequisite to standing when the appeal is sought by a governmental agency or, perhaps, by a public interest corporation such as the Chesapeake Bay Foundation. A public agency, to have the standing to appeal a zoning decision, need not own property. It must, however, nonetheless show that it is specially aggrieved. Judge Wilner explained for this Court, in *T & R Joint Venture v. Office of Planning and Zoning of Anne Arundel County,* 47 Md.App. 395, 402, 424 A.2d 384 (1980):

> Appellant suggests that under Bryniarski it is necessary for the protestant to be a nearby property owner in order to have standing as an "aggrieved" person, and that such requirement applies equally to county agencies as it does to private individuals ... county officials and agencies have no better or different inherent standing than do

Our opinion did not finally decide whether the CBF and the MRA were actually specially aggrieved or not. It remanded the case to the Board of Appeals for that determination, using the proper definition of aggrievement. The opinion pointed out, however, the type of thing that a would-be protestant must sometimes show in order to be entitled to special aggrievement:

Appellants presented evidence to the Board that they have invested substantial amounts of volunteer time, as well as

---

private individuals. *But the underlying test is not so stringent. Bryniarski does not require the ownership of nearby property as the exclusive prerequisite.* It also speaks of alternative "personal or property rights" that may provide an adequate interest in the proceeding.

(Emphasis supplied). In that case, we concluded that the county Office of Planning and Zoning had failed to establish that it was specially aggrieved. 47 Md.App. at 403, 424 A.2d 384.

In *Maryland-National Capital Park & Planning Commission v. Smith,* 333 Md. 3, 633 A.2d 855 (1993), the Planning Commission sought to establish its entitlement to appeal from a decision by the Board of Appeals:

The Commission argues that, although its particular interest in the subject matter of this litigation is not "different from that suffered by the public generally," *its interest "affects the public generally."* Although we do not disagree with that assertion, *it is legally insufficient to render the Commission "aggrieved."*

(Emphasis supplied). 333 Md. at 12, 633 A.2d 855. (citation omitted). Judge McAuliffe wrote for the Court of Appeals in holding that the Planning Commission had failed to establish that it was specially aggrieved:

Accordingly, we hold that *even though the Commission was a party to the proceedings before the Board of Appeals, it was in no way aggrieved* by the Board's decision. It has not suffered any monetary loss, and by its own admission, has no special personal interest at stake. *The only interest asserted does not differ from that of the public in general.*

333 Md. at 14, 633 A.2d 855. (Emphasis supplied).

By contrast, this Court held in *Hikmat v. Howard County,* 148 Md.App. 502, 813 A.2d 306 (2002), that Howard County, representing its Department of Planning and Zoning, did demonstrate sufficient aggrievement to enjoy standing. Judge James Eyler, 148 Md.App. at 520, 813 A.2d 306, wrote for this Court:

The facts necessary to satisfy the aggrieved requirement, when the petitioner is a governmental entity, appear to be that it have an interest in interpreting, administering, and enforcing the laws in question in a given case.

For a governmental agency, property ownership is not required, but special aggrievement very definitely is.

money, on various submerged aquatic vegetation and oyster reef restoration projects in the Magothy River. The appellants also obtained permits from the State of Maryland in order to further their objectives. CBF has a scientific collection permit from the State of Maryland Department of Natural Resources ("DNR"). That permit allows CBF the right to go back, inspect and retrieve some oysters and reefs in the Magothy River. MRA has a scientific license from the State of Maryland, which permits MRA to take oyster samples, seed the reefs and dive off the reefs in the Magothy River as part of a monitoring program. The testimony from the appellants was that there are few, if any, other such licenses for the River. This evidence was unchallenged by appellees. On remand, the Board must determine whether these investments of time and money and the permits the appellants hold are sufficient to satisfy the first prong of the test for aggrievement.

192 Md.App. at 190, 993 A.2d 1163. A showing of special aggrievement is never automatic.

Protestants such as the Chesapeake Bay Foundation and the Magothy River Association are clearly special cases. Ordinarily, if not universally, an individual citizen as protestant will, almost of necessity, be a property owner. The *Bryniarski* opinion pointed out that all three challengers in that case were "property owners." In discussing standing, the phrase "property owner" was used no less than twelve times, and no alternative status was referred to. On the critical presumptive state of being *prima facie* aggrieved, being a "property owner" is the express *sine qua non:*

> An adjoining, confronting, or nearby *property owner* is deemed, *prima facie,* to be specially damaged and, therefore, a person aggrieved.

247 Md. at 145, 230 A.2d 289 (Emphasis supplied).

The pre-*Bryniarski* opinions all dealt expressly with property owners. *Marcus v. Montgomery County Council,* 235 Md. 535, 538, 201 A.2d 777 (1964) ("Mr. Marcus owns and resides at ... Mr. Vrataris owns and resides at ... M.

Molyneaux owns and resides at...."); *DuBay v. Crane,* 240 Md. 180, 213 A.2d 487 (1965); *Wilkinson v. Atkinson,* 242 Md. 231, 218 A.2d 503 (1966); *White v. Major Realty, Inc.,* 251 Md. 63, 64, 246 A.2d 249 (1968) ("the appellants . . . who own and reside at...."); *Wier v. Witney Land Co.,* 257 Md. 600, 608, 263 A.2d 833 (1970) (three separate "property owners"); *Maryland–National Capital Park and Planning Commission v. Rockville,* 269 Md. 240, 248, 305 A.2d 122 (1973) (*"Neither the Commission* nor the *County owns any property* located within sight or sound of the subject property and have *no special interest or damage to give either of them the status of an 'aggrieved party,'* necessary to present an appeal.") (emphasis supplied). The post-*Bryniarski* opinions, except for the *Clickner* case, do not break stride. *120 West Fayette Street v. Mayor and City Council of Baltimore,* 407 Md. 253, 270, 964 A.2d 662 (2009) ("120 West Fayette's allegations that it owned property affected by the redevelopment . . . constitutes sufficient standing to maintain their action in court."); *Committee For Responsible Development on 25th Street v. Baltimore,* 137 Md.App. 60, 86, 767 A.2d 906 (2001) ("Generally, to be an aggrieved party, *the complaining property owner* must be in 'sight or sound' range of the property that is the subject of his complaint.") (emphasis supplied).

Although the caselaw may never have expressly stated that a non-property-owner is automatically disqualified from establishing *prima facie* aggrievement and standing, an extrapolation from everything the caselaw affirmatively has said would seem to support such a conclusion. Indeed, in *Holland v. Woodhaven Building and Development, Inc.,* 113 Md.App. 274, 280, 687 A.2d 699 (1996), Judge James Eyler came very close to stating just such a conclusion for this Court:

> Indeed, there is nothing in the application or otherwise before the Board that indicated that any of the three protestants were *property owners,* let alone owners of nearby property.

(Emphasis in original).

Practical logic supports such a position. Once the boundary line of *prima facie* aggrievement is extended beyond property

ownership, it becomes exceedingly hard to pinpoint where that extension should stop. If one renting a nearby house on a year-to-year basis should be afforded standing to be aggrieved, why should that entitlement not be extended to one renting an abutting or nearby house on a month-to-month basis? How about a week-to-week basis? Would the same entitlement to qualify as an aggrieved protestant extend to a lessee of an apartment as well as to the lessee of a home? What about the long-term renter of a room in a nearby house or even a short-term room-and-boarder? What about the long-term (or even short-term) renter of a room in a nearby hotel or motel? How about a live-in relative (or friend) who pays no rent? Tempting as it might be to move the line in the case of Benn Ray, there is the practical problem of where should the line then be drawn?

In law, of course, it is prudent never to say never. Even if, theoretically, one might in some rare situation establish special aggrievement even as a non-owner, a non-owner will still not be entitled to the presumption of *prima facie* aggrievement. If there are extraordinary circumstances in Ray's case, it was up to Ray to establish them and not take them for granted. That he did not do. His non-ownership of the property would seem to deny him the standing to seek judicial review.

In this case, however, the Court chooses, as did the City, as did the Subject Property owners, and as did the trial court, to overlook the self-evident. We will assume, purely *arguendo*, that the elephant is not in the room. We choose to do this for three reasons. In the first place, our ultimate holding does not depend on Ray's non-ownership status, for he lacks standing for several other independent reasons. In the second place, no one except the Developers have focused on this issue and we have not had the benefit of any significant legal research or legal argument with respect to it. Under these circumstances, we hesitate to elevate our dicta, even though it be thoroughly considered dicta, to the more authoritative status of an actual holding. It would not, after all, have been the pivot on which our decision turned. In the third place, we are

pleased to respond to Ray's contentions on their merits, because they are good teaching tools as negative examples. Accordingly, we will assume, purely *arguendo,* that Ray's standing is as bedrock as if he were the fee simple owner of 279 W. 31st Street.

### How To Qualify As Living "Nearby"?
### Let Us Count the Ways

Does he qualify then for *prima facie* aggrievement? The wild card in the *Bryniarski* deck of "adjoining, confronting, or nearby property owner[s]" is the tetherless adjective "nearby." In terms of entitlement to "prima facie" aggrievement, notions like "touching," "contiguous," "adjoining," "bounding," "confronting," and "abutting" are warm and comforting geometric certainties. The status of being "nearby," by unnerving contrast, is a will o' the wisp. Nearbyness, like beauty, is in the eye of the beholder. It frustratingly eludes the butterfly net of rectilinear thinking. By zoning developers, it is something conceded only grudgingly by inches. By would-be protestants, it is something dispensed bounteously by furlongs.[4] By what folly did a word so evanescent ever make it into the caselaw? It is more than a word; it is a minefield. In *Holland v. Woodhaven Building and Development, Inc.,* 113 Md.App. at 281 n. 3, 687 A.2d 699, Judge James Eyler gave us his thought on the ambiguity of being nearby:

> As an aside, we note that the issue of what constitutes a 'nearby' property owner is, itself, a question of fact which may turn on such circumstances as the topography of the subject property and its environs and the nature of the proposed development.

■ The word "nearby," if not abused, serves a salutary purpose in zoning challenge law. It recognizes the proximate impact on the second tier of surrounding property owners even when they are not literally contiguous to or abutting on the source of their concern. The quality of being "nearby" may embrace even a third tier. It is when misapplied to the

---

**4.** A furlong is 220 yards. Hence, eight furlongs make a mile.

fifth and the sixth tiers, however, that "nearby" is being exploited beyond its reasonable limit. Being "nearby" is a notion that shares the basic concerns of proximity with the "contiguous," the "confronting," the "bounding," and the "abutting." It cannot be reduced to mathematical measurement, but it is a "close-in" thing and not a "distant" thing. It is a neighborly thing and not a mere technical qualification. One can sense it even when one cannot define it. In this case, one does not sense that either Coyne or Ray are truly "nearby."

### The Basic Geography of *Prima Facie* Aggrievement

■ The appellant Coyne lives at 2738 Guilford Avenue. That is 0.4 miles from the proposed 25th Street Station, as the crow flies. According to Mapquest, the driving distance is .63 miles. It is four blocks east and three blocks north of the nearest (northeast) corner of the site. The appellant Ray lives at 279 W. 31st Street. That also is 0.4 miles from the proposed 25th Street Station, again as the crow flies. That is six blocks north plus one lateral block[5] from the nearest (northwest) corner of the site. According to Mapquest, the driving distance is .61 miles. As a general proposition, a distance of between 0.4 miles and 0.63 miles is beyond the range of being nearby. So is a distance of six or seven busy city blocks.[6] For Ray, moreover, to travel north across 29th

---

5. One would have to walk one block west from Remington Avenue to Huntingdon Avenue in order to proceed south to 25th Street. Remington Avenue, southbound, deadends at 27th Street.

6. In *Committee for Responsible Development on 25th Street v. Baltimore*, 137 Md.App. at 87 n. 11, 767 A.2d 906, Judge Kenney noted that the range of a decision's adverse impact is generally more restricted in an urban area than in a rural one:

   The Court of Appeals has long recognized that the *impact of zoning decision in rural and semi-rural areas can be different than in urban and suburban areas.* That is, neighborhoods *in rural areas* may extend farther, because *the damage from a particular decision may be much wider reaching, than in an urban* or suburban *setting. Pattey v. Bd. of County Comm'rs for Worcester County*, 271 Md. 352, 363, 317 A.2d 142 (1974).

Street is, effectively, to go into a completely different neighborhood.

In *Cassel v. City of Baltimore*, 195 Md. 348, 353, 73 A.2d 486 (1950), "less than 100 feet from the property in dispute" was considered appropriately nearby. In *Marcus v. Montgomery County*, 235 Md. at 538, 201 A.2d 777, there were three would-be protestants. One who lived a block away from the proposed project was deemed to be *prima facie* aggrieved. The two who were, respectively, 3/4 of a mile away and 1/4 of a mile away were not *prima facie* aggrieved and their challenges were dismissed. The property owners who were not sufficiently nearby in *DuBay v. Crane*, 240 Md. at 183–84, 213 A.2d 487, were 1) 1,500 feet away (the appellants in the present case are between 2,112 feet and 3,326 feet away) and 2) 0.4 miles away (precisely the same as the best figure for the two appellants here). In *Wilkinson v. Atkinson*, 242 Md. at 233, 218 A.2d 503, the landowner who was beyond the pale of nearness was 750 feet away (between one-third and one-fourth of the remoteness of Ray and Coyne in this case). In *White v. Major Realty*, 251 Md. at 64, 246 A.2d 249, a distance of ½ a mile was too far for *prima facie* aggrievement. In *Committee for Responsible Development on 25th Street v. Baltimore*, 137 Md.App. at 86, 767 A.2d 906, five blocks (compared to seven blocks for each appellant in this case) was considered too far to enjoy "nearby" status:

> *Armstrong does not live so close* to the Property *that he is 'per se' aggrieved. Armstrong lives two blocks west and three blocks north of the Property,* and he cannot see it or hear activity taking place on it from his house.

(Emphasis supplied).

In her Memorandum Opinion and Order of March 10, 2011, Judge White ruled as follows:

> *Petitioners* are not "adjoining, confronting or nearby" property owners and thereby *do not enjoy prima facie*

---

(Emphasis supplied).

*aggrieved status . . . . Their residences are far removed from the subject property.*

(Emphasis supplied). We agree.

### The Riddle of Visibility

Superimposed upon linear distance, however, there is also visibility, as a modifying factor. If the project being developed is in the clear sight of the property owner, that visual factor enhances nearness. If, on the other hand, the project cannot be seen from the would-be protestant's property, that visual shielding diminishes the impact of nearness. As the Court of Appeals noted in *Wilkinson v. Atkinson*, 242 Md. at 235, 218 A.2d 503, "Visibility is one of the elements of proximity."

Both appellants in this case are pushing the visibility factor hard. They are, indeed, stretching their *prima facie* aggrievement claims to the limits of their logic. Charitably, it might be said that their arguments based on being within sight of the PUD are so attenuated as to be at (if not beyond) the breaking point. The harsher reality may be that their arguments are being reduced to parodies of themselves.

The question "Is one nearer to what is in view than to what is not in view?" inevitably provokes the Clintonesque response, "It all depends on what 'in view' means." By invoking the visibility factor to support their nearness to the 25th Street Station, the appellants, perhaps unwittingly, have given us an excellent teaching vehicle to illustrate, by negative example, what being "in view," for standing purposes, does not mean. Gertrude Stein to the contrary notwithstanding, it is not necessarily true that a view is a view is a view. The difference between a ringside seat and the last row in the bleachers becomes, at a certain point, not merely a quantitative difference but an actual qualitative difference.

Quantitatively, a number of appellate opinions have at least brushed up against the subject. Qualitatively, they have little more than scratched the surface. When a protestant is not an abutting property owner but only an ostensibly nearby prop-

erty owner, being close enough to have a good view of the proposed rezoning site is one of the characteristics of being nearby. In *Marcus v. Montgomery County Council,* 235 Md. at 538, 201 A.2d 777, the Court of Appeals noted, with respect to one of the property owners who was deemed to be without standing, "There is no evidence that his home is within sight of the subject properties." With regard to one of the property owners who lacked standing in *DuBay v. Crane,* 240 Md. at 185–85, 213 A.2d 487, the Court noted that even if the owner could see the rezoning site from 1500 feet away, the intervening presence of the Baltimore Beltway provided an adequate shield:

> The appellant DuBay is the nearest (a distance of 1500 feet) to the reclassified property, but his property is on the opposite side of the Beltway, which, if not a complete shield against the apartments to be constructed, will serve as an adequate barrier. The appellants Aiken and Rice both reside a considerable distance (more than four-tenths of a mile) and possibly out of sight of the proposed apartments.

In *Wilkinson v. Atkinson,* 242 Md. at 234, 218 A.2d 503, the would-be protestant unquestionably had a good view:

> *Mrs. Siegel testified that she could see the reclassified property from her home;* the Siegel home is on the highest elevated point of the development in which she lives and *Mrs. Siegel can see directly over the Beltway and view the property across it* ... She thought the erection of *an apartment complex, which could be seen from her home,* would have an adverse effect upon the resale value of her property.

(Emphasis supplied). The opinion of Judge Oppenheimer for the Court of Appeals held not that Mrs. Siegel lost on the ultimate merits but that she did not even enjoy standing to raise the challenge.

> Visibility ..., as Judge Menchine noted, *has been referred to as one of the factors giving rise to standing.* E.g., *Marcus, supra; Pressman v. Mayor and City Council of Baltimore,* 222 Md. 330, 160 A.2d 379 (1960), and *Cassel v.*

*Mayor and City Council of Baltimore,* 195 Md. 348, 73 A.2d 486 (1950). Of itself, however, where, as here, the visibility is only across a broad beltway, and there is no probative evidence of any other specific interest or damage to the use or value of the protestant's property, *mere visibility is not enough to give the requisite standing.*

242 Md. at 235, 218 A.2d 503 (emphasis supplied).

In *White v. Major Realty, Inc.,* 251 Md. at 63, 246 A.2d 249, "There was no evidence that . . . the protestants could even see the subject property from their Central Avenue property." In *Maryland–National Capital Park and Planning Commission v. Rockville,* 269 Md. 240, 248, 305 A.2d 122 (1973), Judge Barnes wrote for the Court of Appeals:

> *Neither the Commission nor the County owns any property located within sight or sound of the subject property* and have no special interest or damage *to give either of them the status of an 'aggrieved party,'* necessary to present an appeal from any action by Rockville, even if otherwise available.

(Emphasis supplied). In *Committee for Responsible Development on 25th Street v. Baltimore,* 137 Md.App. at 86, 767 A.2d 906, Judge Kenney described why a would be protestant lacked standing:

> Armstrong does not live so close to the Property that he is 'per se' aggrieved. Armstrong lives two blocks west and three blocks north of the Property, and he cannot see it or hear activity taking place on it from his house.

The appellant Coyne raises a visibility issue so basic that it has always heretofore been taken for granted. He acknowledges that from his home at 2738 Guilford Avenue, he cannot see the PUD site. He nonetheless contends:

> He works in an office building located at 2715 N. Charles Street, Baltimore, Maryland 21218, which is about three blocks from his home and four blocks from the Subject Property. He can clearly see the Subject Property from his place of employment. He testified that he will be able to

hear the construction of the 25th Street Station project from his office.[7]

The line of sight factor, as an indicium of nearness to a zoning project, has universally been measured from the property of a would-be protestant. The appellant Coyne cites no law for the proposition that it might be measured, instead, from a place of employment. He does not undertake an argument in that regard. He goes on blithely to describe his visual grievances as if the lack of a valid vantage point were utterly immaterial. It is not.

■ We hold that, as a factor in the nearness equation, the ability to view the site of the zoning project must be measured from one's property. It is not measured from one's place of employment. It is not measured from the route one regularly travels to work. It is not measured from the evening itinerary in walking the dog. It is not measured from the restaurant where one regularly has lunch. If the appellant were serious in pushing for the place of employment as the critical vantage point, we would like to pose the following question: "If a would-be protestant lived idyllically in the Green Spring Valley, could he nonetheless acquire standing to challenge the 25th Street Station by taking a job at the 25th Street Station?" His view of the project would in such a case be unassailable. The answer, of course, is, "No."

■ The appellant Ray raises a different and problematic visibility issue. The scene one daily looks out upon from the living room window or from the rocking chairs on the front porch is a significant factor in one's quality of life. It is infinitely more pleasant to gaze upon a setting for Norman Rockwell than to confront the Dickensian smokestacks of Birmingham or Leeds. Whether bane or boon, they are a big part of living nearby. For those respective vistas to be pertinent, however, it is necessary that one actually be able to

---

7. Ironically, Coyne's place of employment is the office of the Johns Hopkins Press. The manager of the Johns Hopkins Press is on record as supporting the 25th Street Station project.

see them. *White v. Major Realty, Inc.,* 251 Md. 63, 64, 246 A.2d 249 (1968) ("There was no evidence ... that the protestants could even see the subject property from their Central Avenue property.").

Having a good view of something, pleasant or unpleasant, is a worthy consideration, but the concept of visibility can easily be abused by overly zealous advocacy. Ray acknowledges that, from his home at 279 West 31st Street, he cannot see the 25th Street Station site when leaves are on the trees or from his first floor level even when foliage is not cloaking his view. He desperately grasps at nearness, however, with the plaint that, in winter at least, he can catch a glimpse of the project site through his second-story bathroom window. That passes the breaking point! If that is a view, it is a view through a periscope. One might as readily invoke the view from the roof. Posit such a glimpse of a corner of a distant rooftop from twice as far away, perhaps from a bathroom window on the fourth floor. Posit such a glimpse from several miles away, perhaps from the heights of Television Hill. Are they still nearby?

■ As a factor in the nearness equation, visibility means nothing less than a *bona fide* view that a casual observer might enjoy or deplore, not a hypertechnical touch by a laser beam. Some forlorn finial, on the distant horizon and devoid of all context, does not produce a sense of nearness. It is not a characteristic of the nearby. It is redolent of the faraway. We do not establish nearness with a sighting through a sniperscope.

### Rebutting Presumptive Non–Aggrievement

■ The bottom line is that neither as a matter of linear geometry alone nor as linear geometry modified by visual considerations do the appellants Ray and Coyne qualify for *prima facie* aggrievement. To be eligible for standing, therefore, they were required to rebut their presumptive non-aggrievement by "alleging and proving by competent evidence ... the fact that his personal or property rights are specially

and adversely affected by the [ongoing] actions." *Bryniarski v. Montgomery County,* 247 Md. at 145, 230 A.2d 289.

Ray claims that the development of the 25th Street Station will severely increase the traffic flow in the neighborhood to his special detriment. Coyne claims that the development of the project will likely lead to a depreciation in the value of his home to his special detriment. They both claim that the 25th Street Station will adversely change the character of their neighborhoods. All three claims, to be viable, must, however, surmount the hurdle of being very special rather than merely general detrimental effects. *Bryniarski,* 247 Md. at 144, 230 A.2d 289, carefully distinguished between a tightly focused special adverse effect and a more epidemic adverse effect "suffered by the public generally":

> Generally speaking, the decisions indicate that a person aggrieved by the decision of a board of zoning appeals is one whose personal or property rights are adversely affected by the decision of the board. The decision must not only affect a matter in which the protestant has a specific interest or property right but *his interest therein must be such that he is personally and specially affected in a way different from that suffered by the public generally.* The circumstances under which this occurs have been determined by the courts on a case by case basis, and the decision in each case rests upon the facts and circumstance of the particular case under review.

(Emphasis supplied). *See also DuBay v. Crane,* 240 Md. at 185, 213 A.2d 487; *Wilkinson v. Atkinson,* 242 Md. at 233, 218 A.2d 503; *Wier v. Witney Land Company,* 257 Md. at 610, 263 A.2d 833; *Committee for Responsible Development on 25th Street v. Baltimore,* 137 Md.App. at 85, 767 A.2d 906.

## A. Increased Traffic Flow:

Ray's fear of an increase in the traffic flow fails that "special detriment versus general detriment" test. Judge Oppenheimer said of just such a complaint in *Wilkinson v. Atkinson,* 242 Md. at 234, 218 A.2d 503:

Her testimony that ... *the expected increased traffic* would create a hazard to her children and other children who take this route to school does not give her the requisite standing; *the inconvenience feared is one likely to be suffered by any member of the public.*

(Emphasis supplied).

*Marcus v. Montgomery County Council,* 235 Md. at 541, 201 A.2d 777, spoke to the same generality of a traffic problem:

Appellants draw attention to the claim that commercial and apartment zoning is likely to bring more people to a given area and that *as a consequence the traffic* and school population *will increase,* and those members of the neighborhood using the local school and shopping area will suffer from the *consequent traffic congestion* and over-populated school facilities. *These are inconveniences likely to be suffered by any member of the public, far or near,* and do not require a denial of the application.

(Emphasis supplied).

The traffic argument simply does not go anywhere. Even if increased traffic would turn out to be a problem, it would be a general problem and not a problem special to the appellant Ray.

### B.  A Drop In Property Value:

The appellant Coyne submitted an affidavit in which he offered his opinion that the 25th Street Station project would lead to a loss in value for his home. Three paragraphs deal with his prediction that property values in the neighborhood will drop.

6.  I am familiar with *property values in my neighborhood.* For the past few years, my wife and I have been interested in purchasing a home to use as a rental property. Accordingly, we routinely look at nearby houses that are on the market. I believe that the 25th Street Station project will adversely affect my property value due to *the effect that*

*Wal–Mart and the 25th Street Station project will have on the local economy.*

7. Today, I would characterize my neighborhood as vibrant, but I believe that Charles Village is close to the edge that exists between a thriving community and one that is in a state of decline. I believe that the planned Wal–Mart and 25th Street Station *project will tip the scales of my neighborhood's health in a negative way.* If local functioning businesses close As a result of the planned Wal–Mart, *then my neighborhood's local economy will be irreparably damaged. The empty business and vacant lots will be a blight on the community, making Charles Village a less desirable place to live.* The attraction of living in my neighborhood is intrinsically linked to the nature of living in a community that by design encourages its residents to walk to work and/or walk to local businesses. Without local businesses in our community, *the character and desirability of living in the neighborhood will diminish,* which will adversely affect the property value of my house.

8. *Closing businesses and overall lower wages in the neighborhood* caused by the planned Wal–Mart will *lead to fewer employed people living in my neighborhood. The housing stock in my neighborhood* is old and requires significant maintenance. I am concerned that *fewer employed people living in Charles Village will lead to a higher number of residents failing to properly maintain their property.* This will cause my home to be less marketable, adversely affecting the value of my home.

(Emphasis supplied).

Quite aside from the fact that Coyne's fears are based on his unsupported and non-expert speculation is the fact that his dire predictions are for the neighborhood generally and not for his own property specifically. He speaks of *"the effect* that Wal–Mart and the 25th Street Station project will have *on the local economy."* (Emphasis supplied). He fears that the "project will tip the scales of *my neighborhood's health* in a negative way." (Emphasis supplied). His express fear is that "my *neighborhood's local economy will be inoperably dam-*

*aged.*" (Emphasis supplied). The impact of closed businesses and the loss of jobs will be "*a blight on the community, making Charles Village a less desirable place to live.*" (Emphasis supplied). Coyne's own predicted plight is based upon his prediction of a general plight for everyone. "[T]he character and *desirability of living in the neighborhood will diminish,* which will adversely affect the property value of my home." (Emphasis supplied). Every adverse impact is a general one affecting the entire neighborhood: "Closing business and overall lower wages *in the neighborhood*"; "fewer people employed *living in my neighborhood*"; "fewer employed people *living in Charles Village*"; and "*a higher number of residents* failing to properly maintain their property." (Emphasis supplied). From start to finish, that is quintessential general aggrievement and not special aggrievement.

No predicted adverse impact is directed specially at Coyne. The only adverse impact predicted for him will be as a result of his being a member of the larger community or neighborhood generally. He does not, therefore, qualify as aggrieved because he is not "personally and specially affected in a way different from that suffered by the public generally." *Bryniarski v. Montgomery County,* 247 Md. at 144, 230 A.2d 289. See also *Wilkinson v. Atkinson,* 242 Md. at 234, 218 A.2d 503.

Our resolution of this subcontention renders Coyne's final contention moot. The contention is that Judge White erroneously refused to receive in evidence his affidavit about his property value. As we have just analyzed at length, however, the entire content of that affidavit bore on the subject of general aggrievement rather than on special aggrievement. The affidavit was, therefore, immaterial to the issue of Coyne's standing to seek judicial review. It was, for that reason alone, inadmissible.

## C. The Character of the Neighborhoods:

Both appellants allege that the 25th Street Station project will have an adverse effect on the Charles Village and Remington neighborhoods. Once again, however, the appellants

allege what is unquestionably a general aggrievement and not something that is a special aggrievement focused particularly on them as individual residents or homeowners.

In *White v. Major Realty,* 251 Md. at 64, 246 A.2d 249, the would-be protestant claimed, *inter alia,* that the zoning change under consideration would "change the entire character of our community." In rejecting the claim, the Court of Appeals held:

> [T]he appellants did not establish *the necessary special damage* to their property *(an adverse effect different than that suffered by the public generally)* to make them "aggrieved" by the Board's order.

(Emphasis supplied).

In *Committee for Responsible Development on 25th Street v. Baltimore,* 137 Md.App. at 89, 767 A.2d 906, a similar allegation was made that the presence of a CVS drugstore would have a deleterious effect on the character of the neighborhood generally. Judge Kenney's opinion for this Court, affirming the trial court's ruling that the protestant lacked standing, concluded:

> While we sympathize with appellant's wish to preserve the historic character and aesthetics of his neighborhood, *we do not find that his interests in the matter are any different than the interests of a member of the general public.*

(Emphasis supplied). *See also 120 West Fayette Street v. Baltimore,* 407 Md. at 270, 964 A.2d 662. A general aggrievement does not confer standing.

**D. The Allegations of Aggrievement Generally:**

With respect to the effort of Ray and Coyne to establish their standing by a showing of special aggrievement, Judge White's ruling of March 20, 2011, was clear:

> *Petitioners have no identifiable injury to a property interest that is special or unique from the general public's grievance* already addressed at the administrative hearing.

Consequently, they are not aggrieved by the administrative decision.

(Emphasis supplied).

Judge White's Memorandum Opinion elaborated:

Petitioners complain ... that the character of their Charles Village and Remington neighborhoods will suffer from increased traffic with the arrival of Wal–Mart, that local businesses and wage rates will suffer, that property values will fall. *These are not special interests or elements of damage unique to Petitioners but are generalized complaints and concerns* for the altered character of neighborhood, *challenges common to area property owners. Petitions have not identified any special effect or distinct impact necessary to confer standing on a particular owner.*

(Emphasis supplied).

Judge White's Memorandum Opinion concluded:

The City Ordinance establishing the PUD at 25th Street Station does not adversely affect Petitioners' specific personal interests or property rights, and *Petitioners are not specially affected in any way different from how the project impacts their neighbors and the general public.* In summary, Petitioners lack standing to seek judicial review.

(Emphasis supplied).

We completely agree with Judge White's decision, which we hereby affirm.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**