43 A.3d 355

## 120 WEST FAYETTE STREET, LLLP

v.

## MAYOR and City Council OF BALTIMORE, et al.

### No. 81, Sept. Term, 2011.

Court of Appeals of Maryland.

April 27, 2012.

M. Albert Figinski (Law Offices of Peter G. Angelos, P.C., Baltimore, MD), on brief, for Appellant.

George A. Nilson, City Solicitor (David E. Ralph, Deputy City Solicitor, and Steven J. Potter, Chief Solicitor, Baltimore City Department of Law, Baltimore, MD; Charles S. Hirsch of Ballard, Spahr, Andrews & Ingersoll, LLP, Baltimore, MD) on brief, for Appellees.

Matthew J. Fader, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Amanda Staken Conn and Phillip Deters, Asst. Attys. Gen., Baltimore, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, DALE R. CATHELL, (Retired, Specially Assigned), JAMES A. KENNEY, (Retired, Specially Assigned), JJ.

BARBERA, J.

In 1999, the Baltimore City Council enacted the "Market Center Urban Renewal Plan" (Urban Renewal Plan), to renew a portion of the westside of Baltimore City. A five-block area located in the westside renewal area, known as the "Superblock,"[1] is part of the plan for redevelopment and has been the subject of protracted litigation between 120 West Fayette, LLLP (120 West Fayette) and the Mayor and City Council of Baltimore (City). This appeal marks the third time we are asked to address a legal issue generated by the ongoing dispute.

---

**1.** The five-block area that makes up the Superblock is bounded by Fayette Street, Howard Street, Lexington Street, Clay Street, and Park Avenue.

We held in *120 West Fayette Street, LLLP v. Mayor of Baltimore*, 407 Md. 253, 258, 964 A.2d 662, 664–65 (2009) (*Superblock I* ), that 120 West Fayette had standing to challenge the legality of the City's entry into a Land Disposition Agreement (LDA) to sell to Lexington Square Partners, LLC (Lexington Square) property in the Superblock. Later, in *120 West Fayette Street, LLLP v. Mayor of Baltimore*, 413 Md. 309, 992 A.2d 459 (2010) (*Superblock II* ), we held that the process for granting the negotiating rights and the resulting LDA were not illegal under the City's Charter and the Urban Renewal Plan, *id.* at 345, 992 A.2d at 481, and the process did not involve an improper delegation of authority from a municipal corporation to a non-profit corporation, *id.* at 354, 992 A.2d at 486. We further held, as not "sufficiently ripe to rise to the level of a justiciable controversy," 120 West Fayette's allegation that in the immediate future the LDA would receive unlawful approval from the Maryland Historical Trust (Trust) because the LDA contained design plans that conflicted with the Urban Renewal Plan's building height restrictions, *id.* at 359, 992 A.2d at 489.

The current iteration of the litigation focuses on a Memorandum of Agreement (MOA) between the City and the Trust relating to the treatment of historic properties in connection with the Urban Renewal Plan. In brief, the MOA requires the City to submit Superblock redevelopment plans to the Trust for review and approval. The Trust's Director and the State Historic Preservation Officer, J. Rodney Little, rejected the first four sets of redevelopment plans submitted by the City. On December 22, 2010, Mr. Little provided conditional approval of the fifth set of plans. The City, on December 30, 2010, agreed to those conditions.

Four months later, 120 West Fayette, Appellant here, filed a complaint in the Circuit Court for Baltimore City seeking a declaration of rights "interpreting the Memorandum of Agreement in light of the facts of this case, and declaring the 12/22/10 letter from Rodney Little to be *ultra vires, ab initio.*" The City, the Baltimore Development Corporation (BDC), Lexington Square, and the Trust, hereafter Appellees collec-

tively, moved to dismiss the complaint. The Circuit Court dismissed the complaint on the ground that 120 West Fayette failed to state a claim upon which relief could be granted because it was neither a party to, nor an intended beneficiary of, the MOA.

We granted the petition of the City and the BDC, and issued a writ of certiorari to consider whether 120 West Fayette can maintain an action that seeks a declaration interpreting the terms of the MOA. *120 West Fayette v. Baltimore,* 422 Md. 356, 30 A.3d 196 (2011). For the reasons that follow, we affirm the judgment of dismissal.

I.

During its 2000 legislative session, the General Assembly appropriated $11.5 million dollars to the Maryland Stadium Authority to rebuild the Hippodrome Performing Arts Center, an historic theater centrally located within the westside development area. *See* 2000 Md. Laws, ch. 204 § 1, DA03.60(2) (FY 2001 Budget Appropriation). The appropriation came with the condition that $1 million of the expenditure hinged on "the City of Baltimore and the Maryland Historical Trust ... reach[ing] [an] agreement on how to minimize the demolition of structures which contribute to the Market Center National Register Historic District." *Id.*

In addition to the requirements of the FY 2001 Budget Appropriation, Maryland law[2] requires the Director of the

2. *See* Md.Code (2001, 2009 Repl.Vol.), § 5A–325 of the State Finance and Procurement Article (SFP) (requiring, *inter alia,* that a State unit, "[t]o the extent feasible, ... consult with the Trust to determine whether the project will adversely affect any property listed in or eligible for listing in the Historic Register"; and, "[w]ithin 30 days after a State unit notifies the Director [of the Trust] of a proposed capital project ..., the Director shall determine whether the project would adversely affect any property listed in or eligible to be listed in the Historic Register"); SFP § 5A–326 (mandating, *inter alia,* that, "[i]f a historic property is to be altered substantially or destroyed by State action or with financial assistance from a State unit, the State unit shall cause timely steps to be taken to: (1) make appropriate investigations and records; (2) salvage appropriate objects and materials; and (3)

Trust, and federal law [3] requires the State Historic Preservation Officer (SHPO), to determine whether proposed capital projects would adversely affect any property listed in or eligible to be listed in the Maryland Register of Historic Properties or the National Register of Historic Places. Typically in Maryland, a memorandum of agreement constitutes an agreement between a governmental entity and the Trust that the project may proceed on condition that certain stated steps are taken by the State or local government to avoid, mitigate, or satisfactorily reduce any adverse effects on identified historic properties.

On January 31, 2001, the City and the Trust entered into such an agreement, memorialized in the MOA. Then–Mayor Martin O'Malley signed the MOA on behalf of the City, and Mr. Little, as Director of the Trust and with the authority to enter into such agreements delegated to him by the Board of Directors of the Trust, signed the MOA on behalf of the Trust.[4]

The MOA, characterizing as "the Project" the City's undertaking to redevelop the westside of downtown Baltimore, i.e., the Urban Renewal Plan, states that the Project "will include

---

deposit with the Trust the results of the investigations, the records, and the recovered objects and materials").

3. *See* Sections 106 and 110 of the National Historic Preservation Act, 16 U.S.C. §§ 470f and 470h–2(a) (providing, in part, that the head of a federal agency having jurisdiction over a proposed federal undertaking in a state must take into account the effect of the undertaking on any building eligible for inclusion on the National Register of Historic Places by, among other steps, consulting with the State Historic Preservation Officer on means to consider adverse effects on historic properties).

4. State law requires the Trust to appoint a Director who is responsible for determining whether proposed state capital projects would adversely affect historical properties. *See* SFP § 5A–316 & § 5A–325. Federal law likewise requires the designation of a State Historic Preservation Officer (SHPO), who assists federal agencies in determining whether proposed federal capital projects would adversely affect historical properties. *See* 16 U.S.C. § 470h–2. Because the duties of the two offices are so similar, Mr. Little has served as the State Director of the Trust and federal SHPO, concurrently, for the past 32 years.

significant rehabilitation of existing buildings as well as demolition and new construction." Moreover, "in consultation with the Trust, the City acknowledges that the Project may have adverse effects on properties within the Market Center Historic District, which is listed in the Maryland Register of Historic Properties and the National Register of Historic Places." The MOA further states that, "in accordance with [the relevant State law provisions], the City and the Trust have consulted to determine means of avoiding, mitigating or satisfactorily reducing the adverse effects of the Project on historic properties." The City therefore "anticipates that the Project will require support and actions from various State and Federal agencies which actions will necessitate conformance with the requirements of [State and federal law]."

The MOA includes the agreement of the City and the Trust that "the Project will be implemented in accordance with the following stipulations in order to take into account the effects of the Project on historic properties." Among those stipulations is that the City "will prepare a strategic plan for the Project" that designates "those contributing historic buildings which the City and the Trust agree are worthy of preservation and those buildings which may be demolished without further consultation between the City and the Trust." The MOA further provides that "[t]he strategic plan will be submitted for the review and comment of the [Market Center Project Area Committee], and the review and approval of the Trust, which approval shall not be unreasonably delayed or withheld." Then, "[u]pon approval by the Trust, the City will pursue amendment of the Urban Renewal Plan to incorporate the approved strategic plan." The MOA details both the approval process by the Trust as well as the City and the Trust's respective obligations in connection thereto. Finally, the MOA provides: "The execution of the MOA and the implementation of its terms evidences that the City has afforded the Trust an opportunity to comment on the Project and its effects on historic properties, and that the City and the Trust have taken into account the effects of the Project on historic properties."

■ The strategic plan contemplated by the MOA was developed in February 2001, within days of the signing of the January 2001 MOA.[5] Over the years that followed,[6] Mr. Little, in his capacity as Director of the Trust and as SHPO, and Jay Brodie, President of the BDC, corresponded through a series of letters regarding plans submitted by the City for the proposed Superblock development. On October 29, 2010, Lexington Square, through the City, submitted to the Trust, for its review pursuant to the MOA, a development plan for the Superblock. The development plan called for the complete demolition of nine buildings and partial demolition of five buildings designated for preservation by the strategic plan.

By letter dated December 22, 2010, Mr. Little granted conditional approval of the proposed development plan.[7] In that letter, Mr. Little, noting that the development plan contained "substantial adverse effects on historic resources," intimated that the development plan was approved because it was the product of Lexington Square's "non-negotiable business model for redevelopment of the Superblock," and the proposed plan had consistently enjoyed the City's support as

---

5. We have taken judicial notice that the strategic plan contemplated by the MOA was created in February 2001 and is available for review on the BDC's website. *Urban Renewal Plan: Market Center*, http://www.baltimoredevelopment.com/sites/default/files/downloads-resources/Market_Center_URP.pdf (last visited Apr. 24, 2012).

6. Because this case is before us from the grant of a motion to dismiss, we assume the truth of all well-pleaded facts and allegations contained in the complaint and "all inferences that may reasonably be drawn from them." *Parks v. Alpharma, Inc.*, 421 Md. 59, 72, 25 A.3d 200, 207 (2011) (quoting *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643, 994 A.2d 430, 433–34 (2010)). All references herein to historical facts comply with this standard.

7. 120 West Fayette dedicates a substantial portion of its brief to the allegation that Mr. Little granted the development plan conditional approval "[u]nder intense political pressure." Specifically, 120 West Fayette asserts that Mr. Little was "muscle[d]" into approving the development plan at a December 16, 2010, meeting between City and State political "heavyweights." We note the gravity of these allegations but do not delve into their specifics here. Whether such a meeting took place and Mr. Little was so "muscle[d]" does not bear on the disposition of the legal issue before us.

"the preferred retail strategy for [the Superblock]." On December 30, 2010, the City and Lexington Square accepted the conditions stated in the December 22, 2010 approval letter.

Sometime in January 2011, the Trust learned of Mr. Little's conditional approval of Lexington Square's development plan. Disagreeing with Mr. Little's disposition of the matter, the Trust voted to ask Mr. Little to rescind his approval. When Mr. Little declined, the Trust transmitted a letter to the Mayor of Baltimore to convey its "serious reservations" about the development plan for the Superblock. The Trust also contacted counsel in the Office of the Attorney General for advice on the legal viability of challenging Mr. Little's approval. Of relevance here, the Trust took no further action, legal or otherwise, to challenge Mr. Little's conditional approval.

### The Complaint

On April 19, 2011, 120 West Fayette filed a complaint in the Circuit Court for Baltimore City challenging Mr. Little's actions as *ultra vires* and illegal under the MOA and requesting declaratory relief. The complaint names as defendants the City, the BDC, Lexington Square, and, as a "necessary party," the Trust. The complaint alleges that "interpretation of a contract—the MOA between the State and City—" reveals how the approval process for demolition within the Superblock should have proceeded. The complaint further alleges that the approval process set forth in the MOA was violated when Mr. Little "abdicat[ed] . . . the MOA's contractual preservation mandate" by approving the demolition of nine designated buildings and thereby prohibited the Trust from exercising its proper role under the MOA by unilaterally approving the development plans. The complaint prayed the court to "interpret[ ] the Memorandum of Agreement in light of the facts of this case, and declar[e] the 12/22/10 [acceptance] letter from Rodney Little to be *ultra vires, ab initio.*"

Each Appellee—the City, the BDC, Lexington Square, and the Trust—filed a motion to dismiss the complaint. All Appellees argued, *inter alia,*[8] that 120 West Fayette's claim should

---

8. The City, the BDC, and Lexington Square argued a failure by 120 West Fayette to allege a justiciable controversy because: (1) the action

be dismissed because 120 West Fayette is neither a party to, nor an intended beneficiary of, the private agreement memorialized in the MOA. Appellees pointed out that the MOA explicitly names the City and the Trust as parties to the agreement and does not contain a term or promise for the particular benefit of 120 West Fayette. Therefore, Appellees argued, 120 West Fayette does not possess the requisite standing to file a suit requesting a declaratory judgment that interprets and enforces the MOA's approval provisions.

120 West Fayette answered, arguing that its standing in the matter was beyond challenge. Citing our opinions in *Superblock I* and *Superblock II*, 120 West Fayette asserted that its standing to request declaratory relief for *ultra vires* acts connected to the Superblock was established in *Superblock I* and "perpetuated" by *Superblock II*.

The motions to dismiss came on for a hearing before the Circuit Court, which granted the motions and dismissed the complaint for failure to state a claim upon which relief could be granted. The Circuit Court agreed with Appellees that "[120 West Fayette] ha[s] sued to enforce an agreement, the MOA, which exists between [Appellees], and to which [120

---

is barred by SFP § 5A–325(h); (2) 120 West Fayette is neither a party to nor an intended third-party beneficiary of the MOA that is capable of enforcing its terms; (3) the Trust's Executive Director, Mr. Little, acted within his authority in approving the proposed Superblock development plan; and (4) the MOA provides that, in the absence of Trust action within 30 days, the proposed development plan is deemed automatically approved, thereby rendering moot any claim asserted by 120 West Fayette.

The Trust's motion to dismiss included some of the arguments made by the other defendants and further asserted that: (1) the sovereign immunity of the Trust bars the complaint; (2) the complaint presents a non-justiciable political question not amenable to judicial resolution; and (3) judicial action to enforce the MOA is precluded by the dispute resolution clause of the MOA.

It is unnecessary for us to address, and so we do not address, any argument of Appellees other than the argument accepted by the Circuit Court, that is, 120 West Fayette failed to state a justiciable claim because it is, at most, an incidental beneficiary of the agreement between the City and the Trust.

West Fayette is] not a party nor a beneficiary." [9] The court ruled that "this status does not establish a cause of action for [120 West Fayette] against [Appellees]." Issuing a declaratory judgment interpreting the MOA, explained the court, would be "issuing nothing more than a purely advisory opinion as to [120 West Fayette] and [the City and the Trust]."

120 West Fayette noted an appeal to the Court of Special Appeals. Before the case could be decided by that court, the City and the BDC filed a petition for writ of certiorari in this Court. The City and the BDC also filed an unopposed motion to expedite appellate review, citing the protracted litigation record between the parties in connection with development of the Superblock and the threat of losing State and private capital investment in the Superblock development project should the litigation continue into the 2012 calendar year. We granted both the petition, *120 West Fayette*, 422 Md. at 356, 30 A.3d at 196, and motion and consolidated into the one question below the two questions presented in the petition: [10]

> Was the Circuit Court correct in dismissing 120 West Fayette's complaint requesting declaratory relief, which would interpret and enforce the terms of an agreement between the Trust and the City?

---

9. The Circuit Court specifically noted that, "for the purposes of the present arguments, [120 West Fayette has] standing for the same reasons established by the Court of Appeals in its decision in *Superblock I.*" The court went on to rule that 120 West Fayette, in making its claim as an incidental beneficiary of the MOA, "failed to state a claim upon which relief can be granted."

As we shall discuss further, *infra*, we agree with the Circuit Court's reasoning concerning 120 West Fayette's status and rights as an incidental beneficiary. However, we disagree with the Circuit Court that the principles laid out in *Superblock I* confer standing upon 120 West Fayette to challenge the MOA.

10. The City and the BDC presented two questions for review in their joint petition:

1. Whether an incidental third party beneficiary's challenge to enforce a contract presents a justiciable controversy?
2. Whether [120 West Fayette] has any basis to assert a private cause of action challenging the Trust's review and approval of the proposed Superblock development under the MOA between the Trust and the City?

## II.

■ 120 West Fayette argues that the Circuit Court made a legal error in granting the City's motion to dismiss for failure to state a claim.[11] Specifically, 120 West Fayette argues that the Circuit Court erred in using principles of contract law to analyze its standing, because, in the words of 120 West Fayette, the MOA is "much more than a simple agreement between the City and a State agency." Instead, 120 West Fayette posits that our holdings in *Superblock I* and *Superblock II* support its assertion that it has the requisite standing to request declaratory relief interpreting the MOA, and, thereby, in its words, "give [the Trust] the right to review and rule on demolition plans under the MOA." In essence, 120 West Fayette argues that our prior opinions grant it the ability to sue the City, on the Trust's behalf, in order to return to the Trust a decision-making power granted by the MOA. As we have mentioned, the Circuit Court agreed with 120 West Fayette that those cases conferred "standing"; nevertheless, the court ruled that 120 West Fayette failed to state a justiciable claim because it is only an incidental beneficiary of the MOA between the City and the Trust.

120 West Fayette asserts that in *Superblock I* this Court granted 120 West Fayette taxpayer standing, or alternatively, adjoining property owner standing, "to seek a declaratory judgment" where "[a]ppellant ... claimed unlawful and manipulative actions of the City and BDC." 120 West Fayette argues that it retains taxpayer standing in the instant case because it pays City and State taxes and, like it did in *Superblock I,* challenges acts taken by government officials that were illegal and *ultra vires.* 120 West Fayette further asserts that it maintains its adjoining property owner standing because it remains situated next to the development site and, like in *Superblock I,* the violation it alleges derives from a

---

11. We review for legal correctness a circuit court's grant of a motion to dismiss, *RRC Northeast,* 413 Md. at 644, 994 A.2d at 434, by reference, *see supra* n. 6, to all well-pleaded facts and allegations and reasonable inferences drawn therefrom.

quasi-land use decision. In that regard, 120 West Fayette declares the MOA to be a land use decision because it is "a unique land control device" that "provides an administrative body (The Trust) [with] control [of] demolition in an historic area."

120 West Fayette also is of the view that we confirmed its standing in *Superblock II* to seek declaratory relief in the form of an interpretation of the MOA. 120 West Fayette alleged in the litigation that prompted our decision in *Superblock II* that "[defendants named in the *Superblock II* complaint do] not intend to comply with the standards . . . in the MOA." 413 Md. at 354, 992 A.2d at 487. We held that the allegation did not give rise to a justiciable controversy and therefore was unripe for adjudication. *Id.* at 359, 992 A.2d at 489. We added the following footnote to that discussion:

> We affirm the dismissal of [the unripe claim in] 120 West Fayette's amended complaint without prejudice to 120 West Fayette's right to reassert the claim and seek appropriate relief when the alleged facts have developed to the point that a violation is imminent or has occurred. *See Boyds [Civic Ass'n v. Montgomery Cnty. Council* ], 309 Md. [683] 692, 526 A.2d [598] 602 [ (1987) ] ("The imminence and practical certainty of the act or event in issue, or the intent, capacity, and power to perform, create justiciability as clearly as the completed act or event, and is generally easily distinguishable from remote, contingent, and uncertain events that may never happen and upon which it would be improper to pass as operative facts." (internal quotation marks and citations omitted)).

*Id.* at 358 n. 19, 992 A.2d at 489 n. 19.

120 West Fayette maintains that the above-quoted footnote (footnote 19) provides implicit approval of 120 West Fayette's standing to litigate the claim it raised in *Superblock II,* once that claim became ripe for consideration. 120 West Fayette asserts, moreover, that the claim it raises in the current declaratory judgment action is identical to the non-justiciable claim raised in *Superblock II*. As 120 West Fayette sees it,

footnote 19 serves as an "invitation" to litigate, on behalf of the Trust, the enforcement of a breached promise that was memorialized in the MOA.

We disagree with both prongs of 120 West Fayette's standing argument. We consider first the *Superblock II*-related contention. To begin, the claim 120 West Fayette presents in the current declaratory judgment action (i.e., that Director Little's actions constituted an illegal and *ultra vires* "abdication of the MOA's contractual preservation mandate") is not the same as the claim at issue in *Superblock II* (*i.e.*, that a private developer, Lexington Square, does not intend to comply with the building height standards laid out in the MOA and Urban Renewal Plan). But even assuming, solely for the sake of argument, that the claims here and in *Superblock II* are materially the same, our discussion of the MOA in *Superblock II* did not address directly, either in footnote 19 or elsewhere in the opinion, whether 120 West Fayette would have standing to litigate such a claim, even if ever it were ripe for judicial review. Much less does the footnote constitute a holding of this Court. At most, footnote 19 notes, by citation and an accompanying parenthetical, when the claim raised in *Superblock II* might become justiciable.

▮ We similarly reject the contention that our opinion in *Superblock I* provides 120 West Fayette grounds for legal standing in the instant case. *Superblock I* is fundamentally distinguishable from the case at bar. In *Superblock I*, 120 West Fayette alleged that the City and BDC "unlawfully violated ... *the City's Charter and laws*, to award the LDA [Land Disposition Agreement] to a favored developer." [12] 407 Md. at 260, 964 A.2d at 665 (emphasis added). That allegation was necessary to our holding that 120 West Fayette possessed taxpayer standing, or alternatively, adjoining property owner

---

12. Specifically, 120 West Fayette asserted that the City illegally engaged in a public works project outside of the bidding process provided in Art. VI § 11 of the City Charter, and used a negotiating instrument (an "Exclusive Negotiating Privilege") that was "a concept foreign to the City Charter [and] City Code." *Superblock I*, 407 Md. 253, 268, 964 A.2d 662, 670 (2009).

standing, in that litigation. *See id.* at 268, 964 A.2d at 670 ("In our view, the allegations contained in 120 West Fayette's complaint are also sufficient to establish taxpayer standing. . . . 120 West Fayette's complaint specifically alleges that the LDA agreement is *'in derogation of the Charter and laws of the City.'*"); *see also id.* at 272, 964 A.2d at 673 ("[W]e conclude that the principles that confer standing upon an adjoining . . . property owner to seek judicial review of land use decisions, logically extend to an adjoining . . . property owner that is challenging . . . *illegal avoidance of urban renewal and procurement ordinances.*") (emphasis added).

The complaint we consider in the present appeal does not allege a violation of City law or the City Charter. Instead, the complaint charges Dr. Little and the City with the "abdication of the MOA's *contractual preservation mandate,*" and explains that the *"interpretation of a contract*—the MOA between the State and City—" controls how approval for development plans should have proceeded. (Emphasis added.) Specifically, 120 West Fayette's complaint highlights, as the "gravamen" of the complaint, "[t]he illicit circumvention of appropriate approval for demolition plans." Self-evidently, 120 West Fayette explicitly recognizes the contractual nature of the MOA.

Moreover, the process for "appropriate approval" set forth in the MOA derives from the agreement that the City and the Trust memorialized in the MOA, not from the City Charter or its laws. In essence, 120 West Fayette claimed a violation of a law in *Superblock I,* but claims in the instant case the breach of a contractual provision. The distinction renders inapposite the holding of *Superblock I,*[13] extending tax-payer and adjoin-

---

13. Our dissenting colleagues dispute this point, asserting that 120 West Fayette's action "is not merely based on the terms of the MOA; it is based on State law." Op. at 51, 43 A.3d at 377–78. According to the dissent, 120 West Fayette's complaint alleges a violation of SFP § 5A–326(a)(2), which commands a State unit's cooperation with the Trust to "ensure that no property listed in or eligible to be listed in the Historic Register is inadvertently transferred, sold, demolished, destroyed, sub-

ing landowner standing to a party alleging a violation of an urban renewal ordinance.[14]

---

stantially altered, or allowed to deteriorate significantly." Op. at 40, 43 A.3d at 371.

There are two flaws in the dissent's analysis. First, and foremost, 120 West Fayette is categorically barred from alleging a violation of § 5A–326(a)(2). Section 5A–326(h) explicitly prohibits private causes of action for a State unit's non-compliance with the Trust's review, consultation and cooperation on historic preservation projects. Second, 120 West Fayette, seemingly aware of this statutory bar, did not file a complaint in the Circuit Court asking for declaratory judgment defining State law. 120 West Fayette prayed for the relief of an interpretation of the MOA, claiming only that provisions of the MOA had been violated.

**14.** None of the arguments advanced by Preservation Maryland, National Trust for Historic Preservation and Baltimore Heritage, Inc. (Amici) in support of 120 West Fayette persuades us to a different conclusion. We already have rejected the argument, which Amici repeat, that *Superblock I* and *II* provide the basis for 120 West Fayette's standing. We also reject the suggestion that the very nature of the MOA at issue here entitles 120 West Fayette to bring a declaratory judgment action in connection with it.

Amici cite to *Master Royalties Corp. v. Mayor of Baltimore*, 235 Md. 74, 92, 200 A.2d 652, 661 (1964), in making the broad assertion that "the lower court improperly ignored well-established Maryland land-use law that gives expanded standing to property owners confronted with harmful effects of redevelopment projects." We remain unpersuaded by this assertion because, as we explain *infra*, the MOA before us is not a land use decision. Unlike the urban renewal ordinance at issue in *Master Royalties*, which "approve[d] a renewal plan for Project I of the Mount Royal–Fremont Renewal Area," 235 Md. 74, 82, 200 A.2d 652, 656, or the renewal ordinance at issue in *Superblock I*, the MOA between the City and the Trust was not promulgated by a legislative or administrative body to bind the general public in the development or use of real estate. We therefore decline to apply "well-established Maryland land-use law" to the question of whether a non-party to the MOA has standing to litigate compliance with its terms.

Second, Amici assert that the MOA at issue is a close relative of MOAs entered into pursuant to Section 106 of the National Historic Preservation Act, which effectuate historical preservation goals for federal capital projects. This similarity, according to Amici, gives "added weight" to federal authority interpreting Section 106 MOAs. Consequently, Amici cite to two Section 106 cases, *Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir.2000) and *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287 (4th Cir.1992), which Amici assert stand for the proposition that private citizens possess standing to enforce the terms of an MOA drawn up for historical preservation purposes. Both cases are inapposite to the statutory issue we here decide.

■ 120 West Fayette also argues that it has standing as an adjoining landowner because the MOA is a "unique land control device" that "provides an administrative body (The Trust) [with] control [of] demolition in an historic area." The argument fails in its premise. The MOA is not a land control device—or, perhaps better stated, a "land use decision"—with attendant principles extending standing to nearby aggrieved landowners.

Generally defined, a land use decision is a decision (typically an ordinance or regulation) enacted or promulgated by a legislative or administrative body for the purpose of directing the development of real estate. *See Black's Law Dictionary* 958 (9th ed. 2009) (defining "land use regulation" as "an ordinance or other legislative enactment governing the development or use of real estate"). Important for present purposes, our research discloses not a single case of this Court approving the grant of tax-payer or adjacent landowner standing to an individual or entity in any context other than a challenge to or pursuant to a land use decision, as that term is generally understood. Indeed, in every case of this Court that

---

Of the two, only *Tyler*, the decision of the United States Court of Appeals for the Ninth Circuit, deals squarely with the standing of a non-party, private citizen to enforce the terms of an MOA governing historic preservation of a federal capital project. In that case private home-owners brought suit against the United States Department of Housing and Urban Development and the City of San Francisco, among others, for the breach of an MOA entered into pursuant to Section 106 of the National Historic Preservation Act. 236 F.3d at 1128. The defendant agency and city argued that the plaintiff homeowners could not bring suit to enforce breached terms of the MOA "because they lack[ed] privity of contract and [were] not intended beneficiaries of the MOA." *Id.* at 1134. The *Tyler* court disagreed, holding that the plaintiffs "[had] standing as third-party beneficiaries to the MOA." *Id.* at 1135. The court based its holding on the fact that "Stipulation 5 of the MOA specifically provide[d] that if a 'member of the public' makes a written complaint, 'the City shall take the objection into account and consult as needed with the objecting party.'" *Id.* at 1134. Thus, noted the court, though the plaintiffs were not signatories to the MOA, they were contemplated as beneficiaries of the MOA's terms because they were "specifically referenced in Stipulation 5." *Id.* at 1135.

The reasoning of the *Tyler* court does not apply to the facts of the case at bar. Unlike the MOA in *Tyler*, the MOA in the present case does not provide for a public right of comment.

we have found, the land use decision a party was seeking to challenge or enforce was either an ordinance, variance, reclassification, or special exception provided by a local zoning body, or a permit or license issued by an administrative agency. *See, e.g., Prince George's Cnty. v. Billings,* 420 Md. 84, 97–98, 21 A.3d 1065, 1072–73 (2011) (granting taxpayer and adjoining landowner standing to residents who sought to challenge a departure from design standard and special exception granted by the Prince George's County Planning Board and Zoning Hearing Examiner, respectively); *Superblock I,* 407 Md. at 269–70, 964 A.2d at 671 (granting tax-payer and adjoining landowner standing to a private corporation that sought to challenge a violation of a Baltimore City Council urban renewal ordinance); *Sugarloaf Citizens' Assoc. v. Dep't of Env't,* 344 Md. 271, 298–99, 686 A.2d 605, 619 (1996) (granting farm-owners adjoining landowner standing to challenge issuance of two permits by the Department of the Environment authorizing construction of trash incinerators); *Wier v. Witney Land Co.,* 257 Md. 600, 614, 263 A.2d 833, 840 (1970) (granting landowners adjoining landowner standing to challenge a reclassification and special exception granted by the County Board of Appeals of Baltimore County); *Habliston v. City of Salisbury,* 258 Md. 350, 355, 265 A.2d 885, 887 (1970) (granting landowner adjoining landowner standing to challenge a City of Salisbury ordinance reclassifying land from industrial to residential); *The Chatham Corp. v. Beltram,* 252 Md. 578, 584, 251 A.2d 1, 4 (1969) (granting homeowners adjoining landowner standing to challenge a zoning reclassification granted by the County Commissioners of Howard County); *Aubinoe v. Lewis,* 250 Md. 645, 651–52, 244 A.2d 879, 882–83 (1968) (granting homeowners adjoining landowner standing to challenge a rezoning decision by the Montgomery County District Council); *Bryniarski v. Montgomery Cnty. Bd. of Appeals,* 247 Md. 137, 146–47, 230 A.2d 289, 295–96 (1967) (granting landowners adjoining landowner standing to challenge a special exception granted by the Montgomery County Board of Appeals); *Hertelendy v. Montgomery Cnty. Bd. of Appeals,* 245 Md. 554, 564–65, 226 A.2d 672, 678–79 (1967) (reversing

Circuit Court's determination that appellant was not an aggrieved party, for purposes of standing to challenge a variance granted by the Montgomery County Board of Appeals); *Windsor Hills Improvement Assoc., Inc. v. Mayor of Baltimore*, 195 Md. 383, 394, 73 A.2d 531, 535 (1950) (denying standing to an association seeking to challenge the Baltimore City Board of Municipal Zoning Appeals's grant of a building permit).

Previous opinions of the Court of Special Appeals generally follow the same pattern. *See, e.g., Ray v. Baltimore*, 203 Md.App. 15, 40, 36 A.3d 521, 536 (2012) (denying adjoining property owner standing to individuals challenging a Baltimore City Council zoning ordinance that established a planned unit development); *Handley v. Ocean Downs, LLC*, 151 Md. App. 615, 629, 827 A.2d 961, 969 (2003) (granting homeowners taxpayer standing to challenge the City of Cambridge Board of Zoning Appeals's grant of a special use permit); *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md.App. 479, 507, 822 A.2d 478, 494 (2003) (denying standing to a non-taxpayer who challenged the grant of a zoning variance by the Board of Zoning Appeals of the Town of Willards); *Comm. For Responsible Dev. on 25th Street v. Mayor of Baltimore*, 137 Md.App. 60, 89, 767 A.2d 906, 921–22 (2001) (denying the adjoining property owner standing to a resident challenging issuance of a demolition and construction permit by Baltimore City Board of Municipal and Zoning Appeals); *Holland v. Woodhaven Bldg. & Dev., Inc.*, 113 Md.App. 274, 281–82, 687 A.2d 699, 703 (1996) (denying residents aggrieved status to challenge approval for a residential subdivision by the Town of Hampstead Planning & Zoning Commission); *Cylburn Arboretum Assoc., Inc. v. Mayor of Baltimore*, 106 Md.App. 183, 193, 664 A.2d 382, 387 (1995) (denying standing to an association challenging Baltimore City zoning ordinance that permitted planned use development on a lot); *Grooms v. LaVale Zoning Bd.*, 27 Md.App. 266, 270–271, 340 A.2d 385, 389 (1975) (granting residents standing to challenge resolution and order amending the zoning map enacted by the LaVale Zoning Board); *cf. Long Green Valley Assoc. v. Bellevale Farms, Inc.*, 205 Md.

App. 636, 46 A.3d 473, 2012 WL 2055103 (2012) (granting adjoining landowner standing in a challenge brought pursuant to a Maryland Agricultural Land Preservation Foundation easement that aimed to preserve agricultural character of land at issue and restricted land from being used for commercial, industrial or residential purposes).

The MOA at issue in the present case is not an ordinance, variance or permit. Furthermore, the MOA binds only two parties (as opposed to the general public). The MOA was not enacted by a legislative or administrative body. And, most important, the MOA does not direct the use or development of real estate in the Superblock. The MOA, in short, is not a land use decision.

We also reject the argument of 120 West Fayette that the MOA vested the Trust with authority to "control . . . demolition in an historic area," thereby (as we understand the argument) rendering the MOA a land use decision. Title 5A, Subtitle 3 of the Maryland Code (2001, 2009 Repl.Vol.), State Finance and Procurement Article (SFP) establishes the Trust and sets forth its responsibilities. 120 West Fayette does not direct us to a provision within that Subtitle that expressly empowers the Trust to direct the development of real estate, and we can find none.[15] It appears that the closest express

---

**15.** Under the enumeration of the Trust's powers and duties codified at SFP § 5A–318, the Trust may do the following: (1) adopt regulations to carry out Title 5A, Subtitle 3; (2) take legal action to enforce the subtitle; (3) adopt and use an official seal; (4) contract for services; (5) apply for and accept loans; (6) provide financial assistance to a historic preservation project; (7) acquire and hold real and personal property; (8) acquire securities or other evidence of indebtedness; (9) acquire title to a historic property by conveyance or foreclosure; (10) transfer or dispose of property held by the Trust; (11) make agreements and contracts for the performance of Trust duties; (12) preserve, restore, rehabilitate, reconstruct, protect, document, excavate, salvage, exhibit and interpret historic properties; (13) accept and use gifts for any Trust purpose; (14) apply to Trust purposes any thing of value the Trust receives; or (15) delegate any of its powers to the Director, or one of the trustees. SFP § 5A–318(b)(1)–(15).

Likewise, in accordance with its duties, the Trust must: (1) direct a statewide survey of historic properties; (2) maintain an inventory and register of historic properties; (3) research and document the signifi-

**34**

connection the Trust has to land use decisions is in SFP § 5A–326.[16] Even there, a State unit that "issues permits or

---

cance of historic properties; (4) prepare and implement statewide and regional historic preservation plans; (5) help subdivisions develop local historic preservation plans; (6) carry out programs and activities to protect and preserve historic properties; (7) preserve properties held by the Trust; (8) cooperate with various governmental entities to ensure historic properties are considered at all levels of planning and development; (9) review State unit programs that affect historic properties, and recommend ways to improve their effectiveness; (10) administer financial and technical assistance programs for historic preservation; (11) make recommendations on certification of historic properties for tax credits; (12) provide public education and training relating to historic preservation; (13) encourage public interest in historic preservation; (14) assist the State Historic Preservation Officer in his or her responsibilities; (15) advise the Governor and General Assembly on historic preservation; and (16) submit an annual report of its activities to the Governor and General Assembly. SFP § 5A–318(c)(1)–(16).

Based on this enumeration, we fail to see how the Trust may direct a State unit on the development of real estate under that State unit's control. Even more so, we fail to see how the Trust is entitled to direct a citizen of this State on the development of real estate within the citizen's control. Under SFP § 5A–318(c)(8) & (9), the closest the Trust stands to the locus of a land use decision itself is carrying out its duties of "cooperat[ion]," "review," and "recommend[ation]." In short, the Trust does not and cannot on its own direct real estate development.

16. Entitled "Protection and use of historic properties," SFP § 5A–326 consists of eight subsections that outline how the Trust may effectuate the protection and preservation of historical properties. Subsection (a) provides that a State unit must cooperate with the Trust to identify historic properties under its control, ensure those historic properties are not inadvertently transferred or destroyed, and use historic buildings to the extent possible before acquiring new property. § 5A–326(a). Subsection (b) requires a State unit that transfers an historic property to ensure that the transfer provides for the preservation of the property, "[i]f it is prudent, practicable, and in the State's best interest to do so." § 5A–326(b). Subsection (c) requires a State unit whose actions will result in the alteration or destruction of an historic property to investigate the property, salvage appropriate objects and materials, and deposit everything with the Trust. § 5A–326(c). Subsection (d), discussed above, requires a State unit to give notice to and consult with the Trust when issuing a permit or license that will affect an historic property. § 5A–326(d). Subsection (e) permits the State unit, after consultation with the Trust, to put certain preservation conditions on any license it issues. § 5A–326(e). It also provides that the reasonableness of the conditions are appealable in accordance with the Administrative Procedure Act. § 5A–326(e)(3). Subsection (f) requires the Trust to promulgate regulations for standards, guidelines and procedures to preserve historic properties under State unit control, in order to minimize the

licenses" need only "cooperate" with the Trust by "giving notice to the Trust, on request, of each application for a permit ... [or] license," and, "where appropriate[,] ... consult[ing] with the Trust before the State unit takes final action on the application." SFP § 5A–326(d)(1) & (2).

Because the MOA is not a land use decision, 120 West Fayette cannot rely on the principles that extend standing to an adjoining landowner in review of land use decisions. 120 West Fayette therefore is left only with principles of contract law to establish its entitlement to press a claim for declaratory relief.

██ As we have said, 120 West Fayette recognizes the contractual nature of the MOA. Indeed, by its terms, the MOA is an agreement between the City and the Trust. For the Trust, the MOA establishes a procedure for Trust consultation and approval of development plans with potential adverse effects on historic properties within the Superblock that is in accordance with state and federal law. For the City, the MOA fulfills a condition precedent to receiving the General Assembly's $1 million appropriation for redevelopment of the Hippodrome Performing Arts Center, a key component of the westside Urban Renewal Plan. Therefore, the Circuit Court properly applied principles of contract law to determine whether 120 West Fayette is entitled to seek the declaratory relief requested in the complaint. Under those principles, 120 West Fayette may only ask for declaratory relief interpreting the MOA if it can show that it was a party to, or an intended beneficiary of, the MOA.

 At common law, only a party to a contract could bring suit to enforce the terms of a contract. *Marlboro Shirt Co. v. Am. Dist. Tel. Co.*, 196 Md. 565, 569, 77 A.2d 776, 777 (1951). The common law rule has expanded to permit "third-

---

need for Trust review. § 5A–326(f). Subsection (g) makes the subtitle applicable to any "undertaking" subject to the National Historic Preservation Act. § 5A–326(g). And subsection (h) provides that, "[f]ailure by a State unit to comply with this section does not create a private cause of action under State law." § 5A–326(h).

party beneficiaries" to bring suit in order to enforce the terms of a contract. *Dickerson v. Longoria,* 414 Md. 419, 452, 995 A.2d 721, 742 (2010). "An individual is a third-party beneficiary to a contract if 'the contract was intended for his [or her] benefit' and 'it . . . clearly appear[s] that the parties intended to recognize him [or her] as the primary party in interest and as privy to the promise.'" *Id.,* 995 A.2d at 741 (quoting *Shillman v. Hobstetter,* 249 Md. 678, 687, 241 A.2d 570, 575 (1968)) (alterations in original). It is not enough that the contract merely operates to an individual's benefit: "An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." *Lovell Land, Inc. v. State Highway Admin.,* 408 Md. 242, 261, 969 A.2d 284, 295 (2009) (citation omitted).

120 West Fayette is not a party to the MOA, and, indeed, it does not claim to be. The memorandum states explicitly: "This [agreement] is entered into . . . by and between the Mayor and City Council of Baltimore . . . and the Maryland Historical Trust." Additionally, 120 West Fayette is not a third-party beneficiary of the MOA. The promises and benefits set forth in the MOA are directed solely to the City and the Trust. Nowhere in the MOA is it contemplated that 120 West Fayette is to receive a benefit. 120 West Fayette seems to concede as much in its brief before this Court, explaining that it did not file its complaint in order to obtain a favorable administrative decision; instead, "[120 West Fayette] asked the *nisi prius* court to restore *the Board's* opportunity, conferred by the MOA, to the rightful decision maker, i.e., the Board of Trustees of [the Trust]. . . . The prime intent of the suit *was to give [the Trust] the right* to review and rule on demolition plans under the MOA." (Emphasis added.)

Neither does 120 West Fayette's standing to challenge the City's "allegedly illegal avoidance of urban renewal and procurement ordinances," *Superblock I,* 407 Md. at 272, 964 A.2d at 673, make it a donee or creditor beneficiary of the MOA. And 120 West Fayette does not claim a direct right to compensation from the MOA. *See Montana v. United States,* 124 F.3d 1269, 1273 n. 6 (Fed.Cir.1997) ("When members of

the public bring suit against promisors who contract with the government to render a public service," they "are considered to be incidental beneficiaries unless they can show a direct right to compensation."). In short, the parties to the MOA did not "intend[ ] to recognize" 120 West Fayette "as the primary party in interest and as privy to the promise." *Dickerson*, 414 Md. at 452, 995 A.2d at 741 (quoting *Shillman*, 249 Md. at 687, 241 A.2d at 575).

The Trust ultimately chose not to take any legal action in connection with this matter. Whether 120 West Fayette is satisfied with the consequences of that decision is immaterial, because 120 West Fayette's satisfaction was not contemplated by the private agreement memorialized in the MOA.

We hold that 120 West Fayette, at best an incidental beneficiary to the MOA, may not file a suit requesting declaratory judgment that interprets and enforces an agreement to which it has no part. The Circuit Court did not err in dismissing the complaint.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

BELL, C.J., HARRELL and CATHELL, JJ., Dissent.

BELL, C.J., dissenting, in which HARRELL and CATHELL, JJ., join.

The majority holds that a Memorandum of Agreement between the City and the Maryland Historical Trust is a private agreement to which taxpayers are mere incidental beneficiaries, and as a result, the appellant taxpayer suing to enforce the Agreement, lacks standing to do so. The majority, therefore, affirms the lower court's motion to dismiss the appellant's action, citing a lack of a justiciable controversy. In actuality, the appellant has taxpayer standing, as it alleges a violation of State law by the City and the Maryland Historical Trust through its alleged approval of a land use project. Additionally, the Memorandum of Agreement is a contract so inextricably bound with the land uses to be developed that it

**38**

creates land use standing and cannot be considered a purely private contract. For these reasons, I dissent.

## I.

The appellant is 120 West Fayette Street, LLLP, a business entity and neighboring landowner to the development site in dispute. The appellees are the City of Baltimore ("the City"), the Baltimore Development Corporation ("BDC"), Lexington Square Developers, LLC, d/b/a Lexington Square Partners ("the developers"), and the Maryland Historical Trust ("MHT"). The contract in question is a January 2001 Memorandum of Agreement ("MOA") between the MHT and the City relating to the treatment of historic properties in connection with the Baltimore City Market Center Urban Renewal Area (a land use redevelopment project) commonly known as the "Superblock."[1] It was made necessary, as the majority acknowledges, *120 West Fayette Street, LLLP v. Mayor and*

---

1. In 1999, the Baltimore City Council enacted an urban renewal program for the development of the westside of downtown Baltimore known as the "Market Center Urban Renewal Plan." Lexington Square Developers submitted to the Baltimore Development Corporation ("BDC") its plans for development, which were accepted and subsequently the City and developers entered into a Land Disposition Agreement ("LDA"), the subject of controversy in *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, 413 Md. 309, 992 A.2d 459 (2010) (*"Superblock II "*). "Under the LDA, Lexington Square will receive upon closing a fee simple interest in all property conveyed pursuant to the agreement[,] ... contingent on several conditions, including ... the MHT's approval of the project plan, and sufficient evidence that Lexington Square has financing for the project." *Id.* at 320, 992 A.2d at 467. Further, the Circuit Court for Baltimore City, in its Memorandum of Opinion, recognized the significance of the MOA, stating, in its summary of the current case, "It is agreed by all parties that the MOA is inextricably bound with the Land Development Agreement and, therefore, is likewise bound to the land uses to be developed within the Superblock." *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, No. 24–C–11–002775, slip op. at 5, 2011 WL 1495213.

The majority asserts that this particular case does not involve land use issues. Urban Renewal, including its side agreements, are quintessentially land use issues. The history of urban renewal reflects that it has often been used to dispossess the relatively powerless lower income residents in favor, ultimately, of a privileged few. This case actually involves what many believe to be the most onerous land use tool—

*City Council of Baltimore,* Op. at 18, 43 A.3d at 357 (2012), as a result of the inclusion in the budget bill of language conditioning the Maryland Stadium Authority's receipt of $1 million in funds on "the City of Baltimore and the Maryland Historic Trust . . . reach[ing] an agreement on how to minimize the demolition of structures which contribute to the Market Center National Register Historic District." *See* 2000 Md. Laws, ch. 204 § 1, DA03.60(2). The MOA requires the City to submit Superblock redevelopment plans to the MHT for approval.[2] That MHT is the approval authority is appropriate given the issues and matters at stake and is, in fact consistent with, and authorized by, the statutory authority granted to the MHT by the General Assembly in Maryland Code (2001, 2009 Repl.Vol.) §§ 5A–325 (h)[3] and 5A–326 (h)[4] of

------

urban renewal. The majority's position that this case is not a case involving land use is simply incorrect.

**2.** The MOA expressly provides, in § 4, titled Trust and Review Approval:

"The Trust will review and provide written comments within 30 days after the receipt for all items the City submits for review pursuant to the terms of this MOA. If the Trust fails to approve, disapprove, or approve with conditions any item within 30 days of receipt, the City may proceed with the activity."

The State makes much of the MOA being a private agreement. That emphasis disregards, and at the least undermines, the undeniable fact that it is an agreement forced by the General Assembly, *see* 2000 Md. Laws, ch. 204 § 1, DA03.60(2), and it is also a means to carry out the provisions of, and the MHT's duties under, the State and Finance Procurement Article of the Maryland Code, as we discuss below.

**3.** Section 5A–325(h) states, in relevant part:

"(a) *Duty to consult with Trust on State-financed capital projects.*—(1) To the extent feasible, a State unit that submits a request or is otherwise responsible for a capital project shall consult with the Trust to determine whether the project will adversely affect any property listed in or eligible for listing in the Historic Register."

\* \* \*

"(d) *Determination of adverse effect.*—(1) Within 30 days after a State unit notifies the Director of a proposed capital project under this section, the Director shall determine whether the project would adversely affect any property listed in or eligible to be listed in the Historic Register.

"(2) If the Director finds that the proposed capital project would have a significant adverse effect on a listed or eligible property, the Director and the State unit shall consult to determine whether a practicable plan exists to avoid, mitigate, or satisfactorily reduce the adverse effect.

"(3) If the Director and the State unit cannot agree on a plan, the State unit shall submit to the Council a report of the consultations and the findings and recommendations of the State unit.

"(4) Within 30 days after receiving the report, the Council shall submit to the State unit comments:

"(i) accepting the adverse effect; or

"(ii) recommending practicable alternatives to avoid, mitigate, or satisfactorily reduce the adverse effect.

"(5) The State unit may:

"(i) incorporate in the project the alternatives recommended by the Council; or

"(ii) disagree with the comments of the Council.

"(6) If the State unit disagrees with the comments of the Council, the State unit:

"(i) shall respond in writing to the Council, explaining why the State unit refuses to adopt the measures included in the comments of the Council; and

"(ii) may not proceed with the project for at least 10 working days after responding."

While subsection (d) specifically grants authority to the Trust's "Director," I note that it limits this authority simply to the determination of "adverse effect" on historic properties. Further, with subsection (a) using the language "consult with the Trust, "this Court should read the two subsections harmoniously together. *See Taxiera v. Malkus*, 320 Md. 471, 481, 578 A.2d 761, 765 (1990) ("where two statutes purport to deal with the same subject matter, they must be construed together as if they were not inconsistent with one another.") (internal citations omitted).

4. Section 5A–326 states, in relevant part:
 "(a) *In general.*—In cooperation with the Trust and subject to available resources, each State unit shall:
 "(1) establish a program to identify, document, and nominate to the Trust each property owned or controlled by the State unit that appears to qualify for the Historic Register;
 "(2) ensure that no property listed in or eligible to be listed in the Historic Register is inadvertently transferred, sold, demolished, destroyed, substantially altered, or allowed to deteriorate significantly; and
 "(3) use any available historic building under its control to the extent prudent and practicable before acquiring, constructing, or leasing a building to carry out its responsibilities."

The majority, at *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, Op. at 33, 43 A.3d at 367 (2012), asserts that the appellant cites no "provision within that Subtitle that expressly empowers the Trust to direct the development of real estate" and thus the MOA, which reflects State law, is not, and fails to incorporate, a land use decision. It then states that "SFP § 5A–326 consists of eight

the State Finance and Procurement Article and Section 110 of the National Preservation Act of 1966.[5] These federal and

---

subsections that outline how the Trust may effectuate the protection and preservation of historic properties." *Id.* at 34, n. 16, 43 A.3d at 367, n. 16. In making these statements, the majority is simply wrong. Section 5A–326 (a) is not an optional provision; nowhere does it contain the word "may." As seen above, the provision is mandatory. *Woodfield v. W. River Ass'n,* 395 Md. 377, 388–89, 910 A.2d 452, 459 (2006) ("When a legislative body commands that something be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed.") (quoting *Tucker v. State,* 89 Md.App. 295, 297–98, 598 A.2d 479, 481 (1991)). It states that a City, in cooperation with the Trust, *"shall"* ensure that no property listed in the Historic Register is inadvertently demolished or destroyed. The Superblock is included in the National Register of Historic Places as part of the Market Center Historic District. The Trust's agreement is required when property on that registry is to be transferred, destroyed or altered. That, it seems to me, is certainly the authority to direct real estate decisions, when those decisions involve, as they do here, the transferring, destruction, or alteration of historic properties.

**5.** Section 110 of the National Preservation Act of 1966, or 16 U.S.C. § 470h–2, states, in relevant part:

"(a) *Responsibilities of Federal agencies; program for identification, evaluation, nomination, and protection.*

"(1) The heads of all Federal agencies shall assume responsibility for the preservation of historic properties which are owned or controlled by such agency. Prior to acquiring, constructing, or leasing buildings for purposes of carrying out agency responsibilities, each Federal agency shall use, to the maximum extent feasible, historic properties available to the agency, in accordance with Executive Order No. 13006, issued May 21, 1996 (61 Fed.Reg. 26071) [40 USCS § 3306 note]. Each agency shall undertake, consistent with the preservation of such properties and the mission of the agency and the professional standards established pursuant to section 101(g) [16 USCS § 470a(g) ], any preservation, as may be necessary to carry out this section.

\* \* \*

"(c) *Agency Preservation Officer; responsibilities; qualifications.* The head of each Federal agency shall, unless exempted under section 214 [16 USCS § 470v], designate a qualified official to be known as the agency's "preservation officer" who shall be responsible for coordinating that agency's activities under this Act [16 USCS §§ 470 et seq.]. Each Preservation Officer may, in order to be considered qualified, satisfactorily complete an appropriate training program established by the Secretary under section 101(h) [16 USCS § 470a(h) ]."

state provisions relate to review of projects that may adversely affect historic properties and the consultations that are required to be made in order to avoid or mitigate adverse effects.

The first four redevelopment plans the City submitted to the MHT were rejected on grounds that the developers failed to present a plan acceptable under the MOA, due to a failure to retain enough historic properties. In each instance, the rejection, not surprisingly, was communicated by the Director of MHT, Rodney Little, but on behalf of the MHT.[6] That he was acting in a representative capacity is made clear by the language he used in those rejection letters: "We are writing to provide our initial comments;" "the Trust cannot concur in this plan;" "[w]e have determined that the [development plan] provided to the Trust . . . does not meet the minimum requirements in the MOA and Strategic Plan," etc. In response to the fifth set of development plans, submitted in December 2010, Little, acting without the authorization of the MHT and, therefore, in an individual capacity, gave conditional approval to redevelopment plans that were not appreciably different than the preceding rejected submissions. That this is true is obvious from the letter itself. In it, consistently with the prior letters, Little states "[w]e have reviewed this design for the redevelopment of 'Superblock' and assessed its effects on historic resources . . . [t]he current proposal will have substantial adverse effects on historic resources." He then asserts "[t]he current conceptual design (October 21, 2010) includes revisions and measures that will minimize or mitigate some of these adverse effects[,]" concluding "[o]ur office has determined that the current [Lexington Square Partners] proposal minimizes or mitigates the adverse effects of their project on the historic district . . . [w]ithin these constraints,

---

6. The majority, at *120 West Fayette*, Op. at 17, 43 A.3d at 357, simply states that "Rodney Little[ ] rejected the first four sets of redevelopment plans by the City[,]" but fails to specify that, in doing so, Little used language indicating that the entire Trust made the decision, while he acted only as the official correspondent.

our office is prepared to approve the proposed design with the following conditions...."

Rather than referring to "the Trust," he uses the term, "our office," substituting that entity as the source of the conditional approval. Of greater importance, unlike in the case of the prior letters, where Little did not leave his personal contact information, he ends the letter, "[I]f you have any questions concerning this determination, please contact me at (410) 514–7602 or rlittle@mdp.state.md.us."

The appellant, whose office building is located physically across the street from, and overlooks, the Superblock, filed in the Circuit Court for Baltimore City an action challenging the proposed demolition in the Superblock, premised on Little's approval of the development plans. Naming the appellees as defendants, it alleged, among other things, that the agents of the governmental defendants that purported to approve demolition plans within an area of the Superblock engaged in certain *ultra vires* acts. The gravamen of the Complaint is that the appellees were involved in an "illicit circumvention of appropriate approval for demolition plans" of historically significant buildings in the Superblock. More particularly, the appellant proffered that the City "maneuvered to putatively gain an *ultra vires*, bogus approval for development of the Superblock that spurns statutorily and contractually mandated objectives of preservation in favor of the developer's 'non-negotiable business model.'" As the Circuit Court recognized in its Memorandum of Opinion, "the Plaintiffs assert that it is not the contract between the Defendants, *per se*, that the Plaintiffs seek to enforce, but rather what Plaintiffs term was the ultra vires approval of the plans themselves by the Executive Director of the Maryland Historical Trust." *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, No. 24–C–11–002775, slip op. at 11. In response to the Defendants' counter-assertion that the appellant's lawsuit was based exclusively upon the MOA, the appellant noted "that 'Maryland Historical Trust places heavy reliance on Sections 5A–325 and 5A–326 of the State Finance and Procurement

Article ... [although] neither provision appear[s] on the face of the MOA.' " *Id.* at 12.[7]

7. The majority makes much of the appellant's request, in its original Complaint, for a declaratory judgment interpreting how the approval process for demolition within Superblock should have proceeded under the MOA. *See 120 West Fayette,* Op. at 17–18, 22, 33–34, 43 A.3d at 357, 360, 366–67. It also argues that the appellant did not ask for a declaratory judgment defining State law. *Id.* at 28–29, n. 13, 43 A.3d at 364, n. 13. First, the MOA is an approval mechanism for historic property destruction in connection with the development of the Super-block, the second largest redevelopment project in the history of the State of Maryland; as I discuss in Part III, the MOA, because of the decisions on which the City and the MHT must agree, is so inextricably tied to this Urban Renewal Plan, and represents such an essential step to real estate development, that it creates land use standing on its own. Second, I do not agree that the appellant's request for declaratory relief was deficient.

The first line of the Complaint simply states that it sues the Defendants "for declaratory relief" but does not specify to what regard. Later, in paragraph 6, the Complaint reads "This suit arises now because Mr. Brodie, for Baltimore City, has maneuvered to putatively gain an *ultra vires,* bogus approval for development of Superblock that spurns *statutorily and contractually* mandated objectives of preservation in favor of the developer's [business model]." (Emphasis added). Later, in paragraph 13, the Complaint avers that the developers "[were] awarded the land disposition agreement to develop the Superblock in accord with, *among other things,* the MOA. Indeed, the land disposition agreement specifically requires adherence to the MOA." (Emphasis added). Next, in paragraph 31, right before the appellant cited case law interpreting a governmental employee's authority, the Complaint reads "As pointed out by Preservation Maryland ... Mr Little's *ultra vires* abdication from the Trust's mission exceeded Mr. Little's authority as an agent of the state agency, the Trust, and thus had no legal effect." Finally, under the section entitled "Relief," the Complaint states "Plaintiff prays that a declaration of rights be entered ... interpreting the Memorandum of Agreement in light of the facts of this case, *and* declaring the 12/22/10 letter from Rodney Little to be *ultra vires, ab initio* [.]" (Emphasis added).

It is clear to me that the Complaint properly and consistently requested a declaration that Little's letter was *ultra vires* when considered in the context of the MOA, the Budget Bill requiring it, the statutory basis for the MHT and applicable provisions of the State Finance and Procurement Article. The State statutes that are relevant to the disposition of this case are clear and do not require "defining." Thus, I am at a loss as to why the appellant needed to or should have sought to have them defined. In focusing on Little's failure to comply with the MOA, the appellant emphasized the decisions the MOA required the parties to it to make, so viewing the MOA as a land use document in the sense that it encompassed land use decisions from which taxpayer standing

The Complaint and exhibits detailed the rejection of the four demolition proposals under the MOA because each proposal was not preservation protective. The allegations that the City and developers unlawfully circumscribed the MOA requirements were specified in paragraphs 23 to 29 of the Complaint. Read as a whole, they allege that BDC's president, M.J. Brodie, fearing another rejection of the plans of its chosen developer, gathered, without any notice to the MHT's Board of Trustees, "a meeting among senior representatives of the State ..., the City ... and [the developer] to discuss this serious matter." At the gathering, these "heavyweights" were arrayed against Little and one other Trust employee, according to the allegations of the Complaint, for the purpose of placing intense political pressure on Little for the benefit of the developer. As a result of the meeting, Little, without notice to the Board, and under what he felt was enormous political pressure, issued his letter of conditional and "reluctant acceptance."

The Board of MHT was not advised, by Little, and did not learn of Little's putative approval of the redevelopment plans until a month or so later, when Preservation Maryland, by letter, provided that notification. During the period following Little's purported approval, including that period before the Board of MHT received notification that Little had given approval, the City, despite being aware that the December letter approving the redevelopment plan was from Little and represented the position of his "office," and not the MHT, but acting on that "approval," proceeded to accept the proposed demolition plan. Following a meeting, the MHT Board conveyed its thoughts to the Mayor. "[S]trongly disagree[ing] with the Trust Director's determination in this case" and reiterating what it had said four times before, the MHT Board concluded, "that the current proposal does not conform to the provisions or intent of the Memorandum of Agreement." It

---

may arise. The Circuit Court erred in its interpretation, and the majority mistakenly adopts this erroneous interpretation, of the appellant's Complaint.

asked that the Director's December 22, 2010 letter of conditional approval be rescinded.[8] That request was denied. Indeed, the City, brushed aside the MHT Board's complaint and disapproval.

The appellees all filed Motions to Dismiss the Complaint, which were heard before the parties had a chance to engage in discovery. The trial court granted their motions, dismissing the appellant's Complaint on the grounds that it was neither in privity with, nor a third party beneficiary of, the MOA, a private contract.

## II.

In *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643–44, 994 A.2d 430, 433–34 (2010), we stated:

8. Section 5A–317 of the State Fin. & Proc. Art. of the Maryland Code states that "[o]n request, the Board shall receive legal counsel and services from the Attorney General to carry out the purposes of the Trust." The majority points out that the Trust "ultimately chose not to take any legal action in connection with this matter." *120 West Fayette*, Op. at 37, 43 A.3d at 369.

Shortly after Director Little's approval, on January 18, 2011, Preservation Maryland, Maryland's state-wide historic preservation advocacy organization, sent a letter to Chairman of the MHT, as well as copies to the Mayor, Office of the Attorney General, and several other parties, asserting that Little's letter had no legal authority. In response, the Office of the Attorney General issued an advice of counsel letter stating that, in its view, the Director was authorized to approve the development proposal. First, the letter incorrectly reasoned that the Director had direct authority for his actions based on § 5A–325 (d)'s language, which in actuality only grants the Director the authority to determine "adverse effect" of a development plan on historical properties, but not to single-handedly approve the destruction of such properties; second, the letter incorrectly reasoned that the Board delegated to the Director the authority to make the approval based on the Board's "acquiescing" to the Director's past negotiations relating to the MOA—negotiations which, of course, never amounted to an approval of any development plan. This assertion is clearly incorrect as evidenced by the MHT's request that the approval be rescinded.

Perhaps the MHT Board relied on this response when it chose not to retain the Attorney General in an action against the Director or the City. The record reflects that the MHT Chairman, in response to the Director's approval, requested that the Mayor rescind the conditional approval, a request that was ultimately denied.

Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action for which relief may be granted ... Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct.

(Internal citations omitted).

This Court is also aware that "a motion to dismiss 'is rarely appropriate in a declaratory judgment action.'" *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, 413 Md. 309, 355, 992 A.2d 459, 487 (2010) (*"Superblock II "*) (citing *Broadwater v. State*, 303 Md. 461, 466, 494 A.2d 934, 936 (1985)) (quoting *Shapiro v. Bd. of County Cmm'rs*, 219 Md. 298, 302–03, 149 A.2d 396, 398–99 (1959)). "When a complaint fails to allege a justiciable controversy, however, a motion to dismiss is proper." *Superblock II*, 413 Md. at 356, 992 A.2d at 488. *See also* Md.Code Ann., Cts. & Jud. Proc. § 3–409(a)(1). "To be justiciable the issue must present more than a mere difference of opinion, and there must be more than a mere prayer for declaratory relief." *Superblock II*, 413 Md. at 356, 992 A.2d at 488 (citing *Hatt v. Anderson*, 297 Md. 42, 46, 464 A.2d 1076, 1078 (1983)).

This case, essentially, requires a determination of standing, which must be asserted properly before this Court can address the merits of the allegations. This Court has held, and the majority recognizes, that standing exists in the case of urban renewal plans by virtue of the land use decisions inevitably involved. *120 West Fayette,* Op. at 28, 43 A.3d at 363–64. In *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore,* 407 Md. 253, 272, 964 A.2d 662, 673 (2009) (*Superblock I* ), we stated

"Because 'land use . . . is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned,' *Master Royalties v. Balto. City*, 235 Md. 74, 92, 200 A.2d 652, 661 (1964), we conclude that the principles that confer standing upon an adjoining, confronting or neighboring property owner to seek judicial review of land use decisions, logically extend to an adjoining, confronting or neighboring property owner that is challenging a municipalities' allegedly illegal avoidance of urban renewal and procurement ordinances. *Cf. Schweig v. City of St. Louis*, 569 S.W.2d 215 (Mo.App.1978) (reasoning that since nearby property owners have standing to challenge zoning ordinances, nearby property owners also had standing to challenge the legality of a municipal redevelopment project since the owners could have suffered harm if the project was mismanaged or not completed)."

*See also Boitnott v. Mayor and City Council of Baltimore*, 356 Md. 226, 234, 738 A.2d 881, 885 (1999) ("Maryland has 'gone rather far in sustaining the standing of taxpayers to challenge . . . alleged illegal and ultra vires actions of public officials.' ") (citing *Inlet Associates v. Assateague House Condominium Ass'n*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988)) (quoting *Thomas v. Howard County*, 261 Md. 422, 432, 276 A.2d 49, 54 (1971)); *Sugarloaf Citizens' Assoc. v. Dep't of Env't*, 344 Md. 271, 297, 686 A.2d 605, 618 (1996) ("In actions for judicial review of administrative land use decisions an adjoining . . . property owner is deemed, *prima facie* . . . a person aggrieved.").

The appellant clearly has met the requirements for asserting taxpayer standing in a land use case. Appellant is an adjacent landowner, a State and City taxpayer, and is challenging both a State official's and the City's decision to approve redevelopment of Superblock, and in the process, destroy several historical properties and forever alter the landscape and tone of Baltimore, without proper approval from the MHT, as required by State law. The point of contention with the majority is whether there has been a claim that City and State officials have acted outside of their govern-

mental authority in making a land use decision. There has been. The appellant, in its two-pronged Complaint, *see supra* note 7, alleges that the City, a State unit, purported to circumvent its legal duty of cooperation with the MHT and execute the Land Disposition Agreement ("LDA"), by way of Director Little's conditional approval, in violation of State laws pertaining to the MHT. The majority seems to believe that the appellant's only claim is that Little acted in breach of the MOA. In actuality, the appellant has validly asserted that Little acted *ultra vires* because his actions violated not only the MOA, but provisions of the Maryland Code as well. The majority distinguishes the instant case from *Superblock II*, because, there, 120 West Fayette alleged that the LDA, a land use instrument, violated City laws, whereas here, the MHT approval process, a non-land use instrument, derives from the MOA and not from City law. *120 West Fayette,* Op. at 28, 43 A.3d at 363–64. This assertion is incorrect.

Pursuant to the MOA, it is the MHT's duty to approve, disapprove, or conditionally approve the City's development plans for the Superblock within 30 days of their submission for review.[9] The MHT is "an instrumentality of the State … a body corporate," *see* § 5A–310 (b), that is "charitable and … intended to benefit the residents of the State." § 5A–311 (b). Its governing body is a Board of Trustees of the Trust,

---

**9.** Although the MOA reflects existing State law, it does not provide the exclusive mechanism for providing oversight of urban renewal developments that impact and implicate historical buildings and structures, and the MHT is not the only entity empowered to conduct reviews of such developments and issue approvals. Moreover, the MOA, and its 30–day approval clause, is distinct from, and serves a different function than, the state-mandated "30 day adverse effect" provision. *See* Md. Code (2001, 2009 Repl.Vol.), State Fin. & Proc. Art. § 5A–325 (d). The "Determination of adverse effect," as mandated by § 5A–325 (d) is not binding on the State unit, since ultimately, the State unit can dispute the Trust's findings with the Advisory Council on Historic Preservation, *see id.* § 5A–325 (d)(3), and then may disagree with the comments of the Council and proceed with the project after submitting a written refusal. *See id.* § § 5A–325 (d)(5)-(6). Rather, it is the language of § 5A–326 (a), providing that the State unit, in cooperation with the Trust, shall ensure that no historic property be inadvertently destroyed, that binds the State.

consisting of 15 trustees, § 5A–313 (a)(1), eight of whom constitute a quorum. § 5A–315 (a). "The Board shall exercise the powers and duties of the Trust," § 5A–318 (a), although it may "delegate any of the powers of the Trust to one or more trustees or the Director." § 5A–318 (b)(15). The Director acts as the chief administrative officer of the Trust, § 5A–316 (a)(2), performing his duties, however, "[u]nder the direction of the Board" and as "the Board prescribes." § 5A–316 (e). The 30–day approval clause in the MOA derives from § 5A–326 (a)(2), which states that, "[i]n cooperation with the Trust and subject to available resources, each State unit shall . . . ensure that no property listed in or eligible to be listed in the Historic Register is inadvertently transferred, sold, demolished, destroyed, substantially altered, or allowed to deteriorate significantly[.]" It is significant that it is the "Trust," and not the Director, to whom the § 5A–326 (a)(2) responsibility, in cooperation with a State Unit, of safeguarding historic properties is entrusted. It is also significant that § 5A–326 (a)(2) is a provision that authorizes the Trust, for the benefit of State residents, to protect historical properties by preventing their sale, destruction or alteration. These actions are land use decisions of an administrative body and State unit, especially given the instant context.

The Director, as mandated by the State and Finance Procurement Article of the Maryland Code, is not authorized to make decisions single-handedly about the destruction of historic properties, as his authority stems only from power delegated to him by the Trust. All decisions are required to be made by the Trust, meaning, at minimum, a quorum of the MHT Board members, and for the intended benefit of the State's residents. Here, the appellant has alleged that BDC President Brodie and MHT Director Little exercised power not delegated to them when they circumvented the MHT's Board of Trustees review and approval responsibility to enact a development plan that, due to its endorsement of the destruction of multiple historic buildings, had previously been deemed insufficient, by the MHT, to meet the MHT standards. There is clear evidence, in the light most favorable to

the appellant, *see RRC Northeast,* 413 Md. at 643–44, 994 A.2d at 433–34, that Little was not merely exercising powers delegated to him by the Trust, because the Trust almost immediately expressed disapproval of his act and attempted to rescind his conditional approval to halt the Urban Renewal Plan. The appellant's action is not merely based on the terms of the MOA; it is based on State law, and therefore the appellant has properly asserted its standing as a taxpayer.

The majority distinguishes the instant appeal from *Superblock I,* holding that, here, 120 West Fayette failed to state a justiciable claim because it is only claiming a breach to a contractual provision to which it was not privy, whereas in *Superblock I,* 120 West Fayette claimed a violation of the Baltimore City Charter or City laws. *120 West Fayette,* Op. at 28, 43 A.3d at 363–64. I disagree. Looking strictly at the Complaint, as this is a standing issue, in the light most favorable to the appellant, *see RRC Northeast,* 413 Md. at 643–44, 994 A.2d at 433–34, there is a valid taxpayer challenge to the unlawful approval by the City and State. The majority also distinguishes the instant appeal from *Superblock I,* and several other cases, because, here, there has been no violation of a land use ordinance, zoning classification, development permit, etc. *Id.* at 30–31, 43 A.3d at 365. I also disagree with that conclusion, as this Court has never so strictly defined or limited the definition of a land use decision.

In *Superblock I,* the appellant sued the City, alleging that it illegally entered into the LDA, a *private land use contract,* to sell the Superblock to Lexington Square Partners, LLC. 407 Md. 253, 258, 964 A.2d at 664. 120 West Fayette argued that the City, and its agent, the BDC, unlawfully violated and manipulated the Request for Proposals process, in violation of the City's Charter and laws, to award the LDA to a favored developer. That it was the *manner* in which the LDA was awarded, and not the LDA terms themselves, that formed the basis of the complaint, is significant. *Superblock I* at 260, 964 A.2d at 665. It also alleged that the City unlawfully delegated urban renewal powers to the BDC by giving it the power to choose developers while the City merely appeared to be the

decision-maker. *Superblock II*, 413 Md. at 353, 992 A.2d at 486. Again, it was the authority to hire developers that was considered a land use decision, not the actual sale or transfer of real estate. Accordingly, 120 West Fayette sought a declaratory judgment declaring that the City's award of the LDA to Lexington Square was illegal and *ultra vires*. We agreed that 120 West Fayette had standing, and we remanded the case so a declaratory judgment could be issued. *Id.* at 273–74, 964 A.2d at 673–674. As a result, in *Superblock II*, this Court considered the merits of that issue, and ultimately held that the award of the LDA was not *ultra vires*.[10] Through these holdings, it is clear that "land use decisions" include all preliminary decisions and approval mechanisms and are not limited only to the actual land transfer devices.

Here, the MOA is a contract, albeit one mandated specifically, and enforced, by State law, *see* 2000 Md. Laws, ch. 204 § 1, DA03.60(2), just as the LDA is a contract, which contemplates and indeed prescribes land use decisions, with regard to

---

**10.** *Superblock II* was an appeal from the Circuit Court's "grant of summary judgment [to the City, the BDC, and the Lexington Square developers,] on 120 West Fayette's original complaint and that court's grant of the City's motion to dismiss Count Two of 120 West Fayette's amended complaint." 413 Md. 309, 317, 992 A.2d 459, 464. 120 West Fayette timely appealed to the Court of Special Appeals, but this Court issued a writ of certiorari on its own motion before the intermediate appellate court considered the case, *see 120 West Fayette v. Baltimore*, 405 Md. 290, 950 A.2d 828 (2008), and stated:

"In sum, we hold that the LDA with Lexington Square is not subject to the [City Charter's] competitive bidding requirements because the LDA is not a public work contract. The project is neither for public use nor publicly funded. We further hold that the LDA is not *ultra vires* because the process through which the LDA was granted did not constitute an improper delegation of the City's discretionary authority as related to urban renewal and redevelopment of the 'Superblock.' Finally, we hold that, because none of the allegedly violative design plans for the 'Superblock' has been finalized or approved, and none of the facts evidences the City's intent to adopt a proposal that violates the MOA or the Renewal Plan, 120 West Fayette failed to allege facts sufficiently ripe to rise to level of a justiciable controversy. For these reasons, we affirm the judgment of the Circuit Court; dismissal of Count Two of 120 West Fayette's amended complaint shall be without prejudice."

*Superblock II*, 413 Md. at 358–59, 992 A.2d at 489.

historical property, to be made jointly by the MHT, an administrative body, and the City. While the LDA purported to sell properties directly to the developers, the MOA directly impacts any such sale or disposition, as it must be complied with and, thus, it determines whether the destruction, transfer or alteration of certain historical properties by developers will be approved or denied. Further, as alleged in *Superblock I*, there is a claim that a public official, Director Little, unlawfully usurped authority not delegated to him. I am convinced that the instant case is not materially distinguishable from *Superblock I*. To be sure, it does not involve an ordinance, but neither did *Superblock I*; involved in both was the unlawful mechanism of awarding a private land use contract to developers as part of a larger urban renewal scheme.

In *Boitnott*, we defined an urban renewal plan pursuant to Article 13, § 24(b) of the Baltimore City Code:

"(b) As used herein a Renewal Plan means a plan, as it exists from time to time for the elimination, correction, or prevention of the development or the spread of slums, blight or deterioration in an entire Renewal Area or a portion thereof. When a plan is applicable to less than an entire Renewal Area, it shall include a description of the boundaries of the area to which it applies. The plan shall include a land use map showing the proposed use of all land within the area to which the plan is applicable, including the location, character, and extent of the proposed public and private ownership ..."

356 Md. at 229, 738 A.2d at 882 (We held in *Boitnott* that the taxpayers had standing to challenge, as unlawful, the enforcement of Ordinance 97–231, a zoning ordinance, as it related to a pre-existing private agreement in connection with an urban renewal plan).

Here, the City, through its developers, was required to, and did, submit development plans, to implement the Urban Renewal Plan, to the MHT for its approval as to the historical properties. The City recognized, as the MOA confirmed, that the urban renewal "Project [would] require *support* and *ac-*

*tions* from various State and Federal agencies which actions [would] necessitate conformance with the requirements of Article 83B, Sections 5–617 of and 5–618 of the Annotated Code of Maryland [11] ... and Section 106 of the National Historic Preservation Act[.]" [12] (Emphasis added). To be sure, the petitioners in *Boitnott* challenged an ordinance, not a contract; however, here, the appellant challenges not just performance of the MOA by the City and the Trust, but, as a result of the failure of performance, the unlawful execution of an approval, an administrative act, of the Urban Renewal Plan. I see no substantive difference between *Boitnott* and the instant case: *Boitnott* involved a land use approval in the form of a legislative act, whereas this case involves a land use approval in the form of an administrative act. In either case, a justiciable controversy exists when a party challenges acts of the City that are *ultra vires*. As we put it in *Boitnott:*

> In any event, "Maryland has 'gone rather far in sustaining the standing of taxpayers to challenge ... alleged illegal and ultra vires actions of public officials.' " *Inlet Associates v. Assateague House Condominium Ass'n,* 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988), quoting *Thomas v. Howard County,* 261 Md. 422, 432, 276 A.2d 49, 54 (1971). The taxpayer plaintiff need not allege facts which necessarily lead to the conclusion that taxes will be increased; rather, the question is whether the taxpayer "reasonably may sustain a pecuniary loss or a tax increase ... whether there has been a showing of potential pecuniary damage." *Citizens Planning and Housing,* 273 Md. 333, 344, 329 A.2d

---

**11.** Now codified as Md.Code (2001, 2009 Repl.Vol.), St. Fin. & Proc. Art., §§ 5A–325 and 5A–326.

**12.** Section 106 of the National Historic Preservation Act, codified as 16 U.S.C.S. §§ 470, is a congressional finding and declaration of policy that "it is ... necessary and appropriate for the Federal Government to accelerate its historic preservation programs and activities, to give maximum encouragement to agencies and individuals undertaking preservation by private means, and to assist State and local governments and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities."

681, 687 (1974). (citations omitted). *See also Castle Farms Dairy Stores, Inc. v. Lexington Market Authority*, 193 Md. 472, 67 A.2d 490 (1949).

*Boitnott*, 356 Md. at 234, 738 A.2d at 885.

While the majority cites a number of cases in attempting to show that our courts generally allow taxpayer challenges to land use decisions only when ordinances, variances or permits are involved, see *120 West Fayette*, Op. at 30–33, 43 A.3d at 365–66, I am not convinced that an unlawful administrative approval fails the test of "land use decision." The case *Sugarloaf Citizens Assoc. v. Gudis and County Council of Montgomery County*, 319 Md. 558, 573 A.2d 1325 (1990), to which the majority does not cite, is instructive. In *Gudis*, four members of the Montgomery County Council, including the respondent Michael Gudis, adopted a resolution approving a potential land site which the County would purchase in order to operate a mass-burn facility in conjunction with PEPCO. *Id.* at 562, 573 A.2d at 1327. The petitioner association, taxpayers in Montgomery County, asked the court to "void the action of the Council [and Gudis in his individual capacity] in approving the Dickerson site and in adopting [the resolution,]" as Gudis owned shares of PEPCO, and his approval was potentially *ultra vires* in violation of the ethics provisions of Montgomery County Code, Chapter 19A. *Id.* at 562–63, 573 A.2d at 1327–28. We held that there was taxpayer standing to assert this claim and void the action of the Council's approval. *Id.* at 566–67, 573 A.2d at 1330. At that point, no ordinance had been passed; no permit issued; and no zoning classification assigned. We allowed the petitioner's peremptory challenge of what it believed was an illegal approval that would eventually lead to a major land use decision.

Standing also is not defeated by the "no private cause of action" clauses inserted in §§ 5A–325 and 5A–326 of the State Finance and Procurement Article. In *Baker v. Montgomery County*, 201 Md.App. 642, 678–79, 30 A.3d 267, 289 (2011), the Court of Special Appeals held there was no private cause of action implicit in § 21–809 of the Transportation Article of the Maryland Code, as it would be inconsistent with the provision

in § 21–809, which details the manner in which to oppose a speeding citation under the statute. The court made sure to specify, however, that, had the petitioners alleged standing as taxpayer plaintiffs, which they did not, the outcome would have been different, based on the language of *Boitnott. Baker*, 201 Md.App. at 679, n. 27, 30 A.3d at 289, n. 27. The lack of a private cause of action contained in the statute did not negate taxpayer standing.

In *Gudis*, we reached the same conclusion. Section 19A–22 (b) of the Montgomery County Code, the ethics provision which Gudis was alleged to have violated, contained a "no private right of action" clause, which the Court of Special Appeals held barred the petitioner's lawsuit. 319 Md. at 566, 573 A.2d at 1330. We disagreed:

Whether § 19A–22 (b) creates an implied or express private cause of action is not critical to our decision and is a question we do not address. A taxpayer or other person specially damaged has standing: to seek to enjoin the implementation of an unconstitutional statute, *Painter v. Mattfeldt*, 119 Md. 466, 87 A. 413 (1913); "to restrain the action of a public official, which is illegal or ultra vires, and may injuriously affect the taxpayer's rights and property," *Inlet Associates v. Assateaque [Assateague ] House*, 313 Md. 413, 441, 545 A.2d 1296, 1310 (1988); *Citizens P & H Ass'n v. County Exec.*, 273 Md. 333, 339, 329 A.2d 681, 684 (1974); or to redress a public wrong, *Becker v. Litty*, 318 Md. 76, 91, 566 A.2d 1101, 1108 (1989) . . . At argument in the trial court on the motion to dismiss . . . Sugarloaf said that it was asserting, among other things, a common law right to seek enforcement of the county ethics law. That is the same sort of standing we upheld in *Becker, supra.*

*Gudis*, 319 Md. at 566–67, 573 A.2d at 1330.

That *Gudis* involved the passage of a County Council Resolution intended to effectuate a development plan, while, here, no legislative action was involved, the City, having purported to secure a required agency approval, signed a development contract, is of no moment. The State granted millions of

taxpayer dollars to a group of public officials for urban renewal. The ensuing decisions, whether in the form of ordinances, city permits, reclassification, state agency approvals, or contracts, so long as they were directly tied to land use and could "injuriously affect the taxpayer's rights and property," *Gudis,* 319 Md. 558, 567, 573 A.2d 1325, 1330 (1990) (internal citations omitted), were land use decisions. In *Gudis,* we did not specify exactly what type of *ultra vires* action by a public official a taxpayer could sue to restrain; in fact, this Court has never drawn any strict lines. Rather, taxpayer standing protects taxpayers potentially affected by the adverse public decisions, decisions that impact their homes and livelihoods, by granting taxpayers authority to challenge acts of public officials that are outside of their authority, even when another public official, such as an Attorney General, is empowered to bring the lawsuit, but fails, for whatever reason, to do so. There is no requirement that land use decisions be in a certain form. What we have here is simply a new set of facts. That the MHT is funded by taxpayers and exists for the benefit of taxpayers is further evidence that its land use decisions should remain freely challengeable by aggrieved parties. The appellant has properly asserted that, due to an unlawful approval of an urban renewal plan, Director Little acted *ultra vires;* and, viewing the assertions in the light most favorable to the appellant, there is a justiciable controversy as to his official actions, rendering the Circuit Court's decision on the motion to dismiss erroneous.

## III.

The majority states that the "MOA between the City and the Trust was not promulgated by a legislative or administrative body to bind the general public in the development or use of real estate," *120 West Fayette,* Op. at 29, n. 14, 43 A.3d at 364, n. 14, despite earlier asserting that the General Assembly, in passing its FY 2001 Budget Appropriation, conditioned a $1 million development expenditure "on 'the City of Baltimore and the Maryland Historical Trust ... reach[ing] [an] agreement on how to minimize the demolition of structures which

contribute to the Market Center National Register Historic District.'" *Id.* at 18, 43 A.3d at 357 (citing 2000 Md. Laws, ch. 204 § 1, DA03.60(2)). The MOA was an integral part of an urban renewal funding bill passed by the General Assembly, it appears, as an incentive for the parties to reach an agreement; [13] after all, § 5A–326 (a)(2) mandates that the State unit and the Trust cooperate to ensure that no historic property be inadvertently destroyed. If the parties could reach an agreement to "purposely" demolish historic properties using the MOA, the provisions of the State Finance and Procurement Article would be met. The MOA, therefore, functions as a compliance tool for § 5A–326; adhering to the agreement would secure the City's receipt of $1 million in funding and would allow implementation of the Urban Renewal Plan. That it was violated certainly created standing for a taxpayer to sue. First, its violation, especially the one alleged here, evidences a noncompliance with State law and potentially creates a public action that was *ultra vires.* Next, as agreed to by all parties, as an overarching matter, the LDA specifically requires adherence to the MOA, and so a violation of the MOA would functionally bar any transfer of property to the developers, thus making it an essential approval device to the Urban Renewal Plan. If the majority's reasoning is correct, a City can effectuate urban renewal through unlawful acts, yet preclude taxpayer claims simply by using the guise of a "private contract." Under that guise, it would make land use decisions, leaving aggrieved citizens with no remedy.

The MOA provides the mechanism for approval of land use decisions, specifically, decisions pertaining to whether to demolish several historic properties in Baltimore in connection with the Superblock project. By its terms, the land use decision authority given to the City is required, in some instances, to be shared by the MHT in the exercise of its

---

**13.** To be clear, I concede that the MOA, standing alone and on its face, is not a land use decision; rather, it is the required approval mechanism embedded in the MOA, and the fact that the MOA is a required step to the execution of the LDA, that gives it its land use properties. The MOA cannot be viewed in isolation.

authority under the State Finance and Procurement Article. Had the MOA been freely and independently entered into by the parties, rather than forced by the General Assembly as part of an appropriations bill, the result may be as the majority posits. Under these circumstances, however, to hold that the MOA is a purely private contract free to be violated without regard to the interests of taxpayers would render the General Assembly's intervention in this project a nullity and without effect. Thus, here, violation of the MOA, essentially, is a violation of State law and the failure of a condition precedent to the Urban Renewal Plan and the development of the Superblock.

I do not agree that the MOA is not an agreement or document affecting land use. It is executed pursuant to a governmental direction, which implicates land use decisions and funding critical to the development of the Superblock project. Therefore, the contract exists for the benefit of potentially affected taxpayers who may challenge in the event of a breach.

I dissent.

Judges HARRELL and CATHELL have authorized me to state that they join in this dissent.